v.

**STATE of Alaska, DEPARTMENT OF FAMILY & YOUTH SERVICES, Appellee.**

**No. S–8663.**

Supreme Court of Alaska.

June 25, 1999.

---

**21.** *See Clauson,* 831 P.2d at 1260–61.

**22.** *Id.* at 1261 (quoting *Lowe,* 817 P.2d at 459).

Stuart G. Ross, Law Office of Stuart G. Ross, Anchorage, for Appellant.

Lisa B. Nelson, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, and James H. Parker, Assistant Public Advocate, Brant McGee, Public Advocate, Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

### I. INTRODUCTION

Upon reversal of his murder conviction, A.A. moved to postpone the hearing on the Department of Family & Youth Services's petition to terminate his parental rights with respect to his son, I.K. The superior court denied A.A.'s request out of concern that a lengthy delay of the termination proceedings would negatively affect I.K.'s best interests. A.A. appeals the superior court's decision to terminate his parental rights, arguing that he had a right to a continuance and that the State failed to make "active efforts" as required by the Indian Child Welfare Act. Because we conclude that the superior court acted within its discretion in refusing to delay the termination trial and correctly found that the State made "active efforts," we affirm.

### II. FACTS AND PROCEEDINGS

M.K., an Alaska Native, gave birth to I.K. on November 4, 1994. I.K.'s biological father, A.A., was arrested on murder charges during M.K.'s pregnancy and has been incarcerated since June 1994. A.A. was convicted of first-degree murder and sentenced to a sixty-six-year prison term in July 1995. Perhaps due to his incarceration, A.A. did not have knowledge of M.K.'s pregnancy or the birth of I.K. until the early spring of 1995.

In March 1995 the Department of Family & Youth Services (DFYS) filed a child in need of aid petition to assume legal custody of I.K., alleging (1) M.K.'s noncompliance with a drug and alcohol treatment program and a case plan for reunification of the family, (2) an extensive child protective services history reflecting M.K.'s narcotic use and neglect of her two oldest children, and (3) M.K.'s residence with her developmentally disabled sister who may have sexually abused M.K.'s oldest child. The petition listed both R.C., M.K.'s boyfriend, and A.A. as potential putative fathers.

On March 14, 1995, the superior court held a probable cause hearing to determine whether I.K. was a child in need of aid. At this hearing, both M.K. and R.C. represented that R.C. was the father of I.K. But on March 29, 1995, M.K. filed a paternity affidavit with the Child Support Enforcement Division (CSED) listing A.A. as the named defendant. Even so, other information in the affidavit reflected M.K.'s belief that R.C. was the father. The paternity information "locate sheet" also named R.C. as the "alleged" or "most likely" father.

DFYS took emergency physical custody of I.K. on April 7 because of M.K's failure to comply with her case plan. At a probable cause hearing on the emergency petition, DFYS raised the issue of the biological father's identity and suggested paternity testing.[1]

While M.K. and R.C. were involved in these proceedings, CSED served A.A. with a complaint at Spring Creek Correctional Center in May 1995, alleging his potential paternity of I.K. A.A. denied paternity and requested blood testing.

The superior court held a review hearing of I.K.'s case in June 1995. DFYS reported that I.K. was still in foster care and that neither M.K. nor R.C. was progressing with their case plans. DFYS again mentioned that "[R.C.] was to get paternity testing because there is a question as to whether he is the biological father." At two subsequent review hearings in December 1995 and February 1996, DFYS still had not determined paternity but announced its intent to terminate any parental rights by including both possible fathers in its termination petition. DFYS subsequently petitioned to terminate the parental rights of M.K. as well as R.C. and A.A., without a conclusive determination of paternity.

Meanwhile, CSED took a blood sample from A.A. for testing in July 1995. Because M.K. did not make her scheduled appointments in August or November of 1995 to submit her sample, CSED contacted I.K.'s foster parent and drew I.K.'s blood to con-

---

1. The parties ultimately stipulated that DFYS had probable cause to believe that I.K. was a child in need of aid.

duct a "motherless" test.[2] At the same time, R.C. informally denied paternity but would not sign an official denial. The "motherless" test later revealed that A.A. was the biological father of I.K. The court entered a judgment declaring A.A.'s paternity in August 1996. At that time, A.A. requested contact with his son and asked that DFYS consider A.A.'s mother for placement of I.K.

While incarcerated following conviction on the murder charge, A.A. has been placed on maximum security status because of extensive assaultive behavior including a recent assault on a prison staff member in April 1997. Yet A.A. has not taken any anger management or substance abuse classes offered at Spring Creek Correctional Center, claiming that those classes do not address his real problem with "fear."

In September 1997 the court of appeals reversed A.A.'s murder conviction. As a result, A.A. moved to continue the termination trial date from December 15, 1997 until after his new murder trial. The superior court denied this request.

The trial court terminated A.A.'s parental rights on April 19, 1998.[3] The court determined that A.A.'s "unresolved problems with violence and impulse control ... placed the child at imminent and substantial risk of physical harm." The superior court specified that it did not consider A.A.'s murder conviction and instead focused on several previous instances of violence, including

> his conviction of Assault in the First Degree in 1987—the shotgun incident; the sword or machete incident with [M.A.]; the violent lunchroom and telephone incidents that he has engaged in while he has been incarcerated[;] his own acknowledgment of domestic violence; and his own explanation and associated demeanor of the incidents above. In addition, it is im-

portant to note that the majority of the above-mentioned incidents occurred after his completion of an Anger Management course in 1987.

The court also found that in accordance with the Indian Child Welfare Act (ICWA) "[a]ctive efforts have been made to provide remedial services, which efforts have been unsuccessful." A.A. appeals both the trial court's denial of his motion to continue and its finding that the State met its "active efforts" requirement.

## III. DISCUSSION

### A. Standard of Review

■ We review a trial court's denial of a motion to continue for an abuse of discretion.[4] We will consider "the particular facts and circumstances of each individual case to determine whether the denial was so unreasonable or so prejudicial as to amount to an abuse of discretion."[5]

■ When reviewing issues of termination, we will affirm a trial court's factual findings unless those findings are clearly erroneous.[6] The question of whether the State has complied with the "active efforts" requirement of ICWA, however, presents a mixed question of law and fact.[7] While we defer to the trial court's factual findings under the "clearly erroneous" standard, we review de novo any questions of law.[8]

### B. The Trial Court Did Not Err in Denying A.A.'s Motion to Continue.

■ Because the reversal of A.A.'s conviction presented the possibility, either through an acquittal or plea bargain, that he might be released, A.A. maintains that the trial court "seriously prejudiced" him by denying his motion to continue. The State responds that continuing the termination trial for a period of time sufficient to allow retrial and, in the

---

2. The standard procedure is to obtain DNA from the father, the mother, and the child.

3. The court also. terminated M.K.'s parental rights. She has not appealed the order.

4. See *Alaska Marine Pilots v. Hendsch,* 950 P.2d 98, 104 (Alaska 1997).

5. *Id.* (citation omitted).

6. See *A.M. v. State (A.M.I )*, 891 P.2d 815, 820 (Alaska 1995), *overruled in part on other grounds by Matter of S.A.,* 912 P.2d 1235 (Alaska 1996).

7. See *A.M. v. State (A.M.II )*, 945 P.2d 296, 304 n. 10 (Alaska 1997).

8. *See id.*

case of acquittal, to allow for A.A.'s rehabilitation upon release, would seriously jeopardize I.K.'s best interests by hindering his timely placement in a stable and permanent home.

■ We have previously addressed whether the trial court should await a final determination of a parent's criminal appeal before proceeding with a termination trial. In *R.F. v. S.S.*,[9] the father's conviction for murder had been affirmed, but the appeal of the denial of his motion for a new trial was still pending.[10] He argued that the trial court should not have terminated his parental rights before resolution of his appeal.[11] In affirming the trial court's decision, we emphasized that "[t]o leave a child in limbo during his formative years based upon the slim chance that R.F. may prevail on one of his many possible post-conviction relief measures contravenes the primary purpose of Alaska's adoption statute: to advance the best interests of the child."[12] Accordingly, in a termination trial, the best interests of the child, not those of the parents, are paramount.[13] Thus, while there are "dangers of relying on a conviction that is not yet final,"[14] a trial court should have the discretion to proceed to a termination trial without a final ruling on a parent's criminal appeal.

■ This case differs from *R.F.* in one significant respect, however. A.A. was not awaiting a decision on his appeal at the time of his termination proceeding; because the court of appeals had already overturned his conviction, A.A. was awaiting a new criminal trial. The Arizona Court of Appeals faced a similar situation in *In re Pima County Juvenile Severance Action*.[15] In that case, the juvenile court terminated a father's parental rights based in part on his conviction for the murder of the mother.[16] Because the Arizona Supreme Court reversed his criminal conviction, the father contended that the ter-

mination proceedings should be continued until after his new trial.[17] The court of appeals affirmed the juvenile court's termination of parental rights, basing its decision on the "grounds for severance [that did] not hinge upon the criminal conviction."[18] We agree with the Arizona Court of Appeals's conclusion that, even when a court has overturned a parent's conviction, that reversal does not prevent termination of parental rights as long as the termination rests on other grounds.

While DFYS presented evidence of A.A.'s current murder conviction in support of its termination petition, the superior court explicitly noted that its decision to terminate rested not on A.A.'s criminal conviction but rather on his extensive history of assaultive behavior after completion of an anger management course in 1987. The court also correctly focused on I.K.'s best interests:

> As for [A.A.] specifically, it is likely that he will be convicted once again of Murder in the First Degree once he is retried. And it is likely that he will receive a sentence even longer tha[n] his previous sentence of 66 years because of his subsequent assaultive conduct while in jail. However, in the unlikely event that he is acquitted, the passage of time to that point, plus the time needed subsequent to the verdict to get him ready to be a safe parent, if that can be done, [I.K.] would be too damaged by that process to wait for that period of time—a year and a half from now at the very least.

Thus, we conclude that the trial court did not abuse its discretion in denying A.A.'s motion to continue.

C. *The Trial Court Did Not Err in Finding That the State Had Met ICWA's "Active Efforts" Requirement.*

In a termination proceeding involving an Indian child, the State must prove by a pre-

---

9. 928 P.2d 1194 (Alaska 1996).

10. *See id.* at 1195.

11. *See id.*

12. *Id.* at 1197.

13. *See id.*

14. *Id.* (quoting *In re Abdullah*, 85 Ill.2d 300, 53 Ill.Dec. 246, 423 N.E.2d 915, 919 (1981)).

15. 162 Ariz. 536, 785 P.2d 56 (App.1989).

16. *See id.* at 58.

17. *See id.*

18. · *Id.*

ponderance of the evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." [19] Although ICWA does not define "active efforts," this court has cited approvingly one commentator's distinction between active and passive efforts:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts, the intent of the drafters of the Act, is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.[20]

In accordance with other jurisdictions' case-by-case approach,[21] we have held that "no pat formula" exists for distinguishing between active and passive efforts.[22]

■ A parent's incarceration significantly affects the scope of the active efforts that the State must make to satisfy the statutory requirement. While "[n]either incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty under ICWA to make active remedial efforts," [23] the practical circumstances surrounding a parent's incarceration—the difficulty of providing resources to inmates generally, the unavailability of specific resources, and the length of incarceration—may have a direct bearing on what active remedial efforts are possible.[24] Thus, while the State cannot ignore its ICWA duties merely because of A.A.'s incarceration, his incarceration is a significant factor in our evaluation of the adequacy of the State's efforts in this case.

A.A. argues that DFYS failed to make active efforts to provide remedial services designed to prevent the breakup of the Indian family as required by ICWA.[25] In particular, A.A. maintains that DFYS "needed to accurately identify the father at the earliest time in order to formulate a case plan to provide the remedial programs to the parents that would be necessary for reunification with them." A.A.'s presentation of this argument conflates two separate issues: (1) DFYS's delay in determining paternity and (2) DFYS's failure to work out a case plan. We address each in turn.

■ A.A.'s argument first raises the issue of whether DFYS's delay in determining paternity can violate the "active efforts" requirement. ICWA defines a parent as "any biological parent or parents of an Indian

---

**19.** 25 U.S.C. § 1912(d) (1983); *see also* Child in Need of Aid Rule 18(c)(2).

**20.** Craig J. Dorsay, *The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual* 157–58 (1984) (citation omitted), *quoted with approval in A.M. I*, 891 P.2d 815, 826 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996); *see also A.M. II*, 945 P.2d 296, 306 (Alaska 1997).

**21.** *See A.M. II*, 945 P.2d at 306 n. 12.

**22.** *Id.* at 306.

**23.** *A.M. I*, 891 P.2d at 827.

**24.** *See id. Cf. In re Dependency of J.W.*, 90 Wash. App. 417, 953 P.2d 104, 108 (1998), *review denied*, 136 Wash.2d 1021, 969 P.2d 1063 (1998) (noting that under the Washington statute, the state can terminate parental rights without offering any services when aggravating circumstances, such as a conviction of rape, assault, sexual abuse, or murder, exist).

**25.** The State briefly argues, citing Justice Compton's concurrence in *In re Adoption of T.N.F.*, 781 P.2d 973 (Alaska 1989), that ICWA's active efforts requirement should not apply to non-Indian parents like A.A.: "Congress gave no indication that it envisioned, when it required that active efforts be made to prevent the breakup of the Indian family, litigation concerning the obligation to provide remedial services to non-Indian incarcerated felons." In *T.N.F.*, Justice Compton agreed with the court's result but disagreed with the court's application of ICWA to the non-Indian mother's action because such application allowed a non-Indian "to further purposes which have nothing to do with furtherance of Indian welfare, so emphatically determined by Congress to be in need of protection." *Id.* at 982 (Compton, J., concurring). But because the State does not ask us to overrule or reconsider our prior position, we do not reach this issue here.

child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. *It does not include the unwed father where paternity has not been acknowledged or established.*[26] Thus, because A.A. did not acknowledge paternity before the blood test, ICWA did not obligate the State to provide such efforts until A.A.'s paternity had been established.[27]

■ The second part of A.A.'s argument contends that DFYS failed to meet ICWA's active efforts requirement because it never fashioned an individualized case plan for him. The State responds that its efforts met the requirement given A.A.'s lack of commitment to treatment and lengthy sentence.

Although we do not condone the State's failure to work out a case plan for A.A., we nevertheless believe that the State fulfilled its active efforts duty in this case.[28] In affirming the trial court's finding on remand in *A.M. v. State (A.M.II)*[29] that the State had made active efforts, we explained the relevance of the parent's willingness to cooperate:

> Our chief concern in remanding the ICWA issue for reconsideration was that the trial court might have determined the scope of the State's duty to make active remedial efforts, not by consideration of A.M.'s "demonstrated lack of willingness to participate in treatment" but rather by reference to "subjective, pre-intervention criteria" relating to A.M.'s "motivation or treatment prognosis."[30]

We noted that "DFYS maintained contact with A.M. while he was in treatment, generally encouraged his treatment efforts, and assisted him in arranging visitation with his children"[31] but that A.M. had been discharged from the state-provided rehabilitative programs for failure to comply with treatment requirements.[32] Thus, although we "remain[ed] troubled by the relative passivity of DFYS's remedial efforts at the early stages of this case," we nonetheless affirmed the trial court's ruling, in part because of A.M.'s failure to participate meaningfully in treatment.[33]

Here, although the State's efforts in relation to A.A. may have been relatively passive, A.A. demonstrated a lack of willingness to participate in treatment.[34] A.A.'s three re-

---

**26.** 25 U.S.C. § 1903(9) (emphasis added).

**27.** Moreover, Alaska's general statutory scheme does not require a determination of paternity to proceed with termination of parental rights. The State may initiate termination proceedings against an unknown father under AS 47.10.080(c)(3). The version of § .080(c)(3) in effect at the time that DFYS petitioned to terminate A.A.'s rights provides in relevant part:

> (c) If the court finds that the minor is a child in need of aid, it shall
> . . . .
> (3) by order, upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a) as a result of parental conduct and upon a showing . . . by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights, terminate parental rights and responsibilities of one or both parents and commit the child to the department. . . .

Similarly, a California court recently held that completion of paternity testing is not necessary to proceed with termination of parental rights in California. *See In re Ninfa S.*, 62 Cal.App.4th 808, 73 Cal.Rptr.2d 209, 211–12 (1998) (denying a father's ·motion to continue based on incomplete paternity testing after granting two previous continuances because "genetics is irrelevant to [ ] the likelihood of [the child's] adoption" and "[b]ecause further delay of the hearing would have interfered with [the child's] need for prompt resolution of her custody status and her right to a permanent placement").

**28.** *See, e.g., Deck v. State, DCFS*, 113 Nev. 124, 930 P.2d 760, 764–66 (1997) (holding that because the mother expressed uncertainty as to paternity and the putative father inquired about how to determine paternity but failed to pursue the matter, the state's failure to work out a case plan before terminating his parental rights did not deny his procedural due process rights).

**29.** 945 P.2d 296 (Alaska 1997).

**30.** *Id.* at 306 (quoting *A.M. v. State (A.M.I)*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by Matter of S.A.*, 912 P.2d 1235 (Alaska 1996)).

**31.** *Id.*

**32.** *See id.* at 305.

**33.** *Id.* at 306.

**34.** To support its claim that it met the active efforts requirement, the State points to the fact

cent assaults on prison staff and inmates, which led to his placement on maximum security status, occurred *after* the reversal of his conviction and the State's filing of the termination petition. Thus, A.A.'s demonstrated failure to participate in treatment continued even after he recognized that his parental rights were at stake.

As we noted in *A.M. II*, "[i]t is of no particular consequence that the Department of Corrections (DOC), rather than DFYS, made these active remedial efforts." [35] Here, although the Department of Corrections has offered anger management classes throughout the period of A.A.'s incarceration, A.A. has not participated because he claims that his problem is "fear", not anger.

Finally, we agree with the State that A.A.'s lengthy sentence justified the level of remedial services the State provided.[36] The length of a sentence is an appropriate factor to consider in evaluating the State's efforts.[37]

For these reasons, we conclude that the State fulfilled its duty under ICWA to make active remedial efforts. Thus, we affirm the trial court's decision to terminate A.A.'s parental rights.

## IV. CONCLUSION

Because the trial court did not err in denying the motion to continue the termination proceedings and because the State fulfilled its duty under ICWA with respect to A.A., we AFFIRM the superior court's granting of DFYS's petition for termination.

---

that the Department of Corrections had offered and A.A. had completed rehabilitative services and programs in the past, resulting in no improvement in his violent tendencies. But this evidence is exactly the type of "subjective, pre-intervention criteria" that we have rejected as a justification for failing to make active efforts. *See A.M. II*, 945 P.2d at 306 (quoting *A.M. I*, 891 P.2d at 827). Thus, we do not base our holding on this evidence.

**35.** *See A.M. II*, 945 P.2d at 305.

**36.** We also note that A.A. has been retried since this appeal. He was found guilty of murder in the second degree on March 10, 1999 and is scheduled to be sentenced on July 9, 1999. *See State v.[A.]*, No. 3AN–S94–4614 CR.

