NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SHELLY S., ) | |
| ) | Supreme Court No. S-14990 |
| Appellant, ) | |
| ) | Superior Court Nos. 3PA-09-00117/ |
| v. ) | 00118 CN |
| ) | |
| STATE OF ALASKA, ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF ) | |
| CHILDREN'S SERVICES, ) | No. 1471 – December 18, 2013 |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Gregory Heath, Judge.

Appearances: Carolyn Perkins, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Appellant. Jessica M. Alloway, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

## I. INTRODUCTION

The trial court terminated a mother's parental rights to her two daughters. The mother appeals, arguing that the court erred in finding that the State Department of

---

\*        Entered under Appellate Rule 214.

Health and Social Services, Office of Children's Services (OCS), made active efforts to reunify her with her children. The mother's position is that OCS should have provided her with services in addition to those it did provide. But the mother did not participate meaningfully in the abundant services that were provided for her, and she offers no indication that she would have participated in additional services. We therefore affirm the trial court's finding that OCS made active efforts to reunify this family and its order terminating the mother's parental rights to her children.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Shelly S. is the mother of Katie, born in 2006, and Daisy, born in 2009.[1] The girls are Indian children for purposes of the Indian Child Welfare Act (ICWA).[2] Katie lived with Shelly until November 2009 when, because Katie suffered serious physical injuries while in Shelly's custody, OCS removed her from Shelly's home and took her into emergency custody. Daisy, who was still in the hospital following her birth, was also taken into emergency custody due to OCS's concern over Katie's injuries. Shelly stipulated that the girls were children in need of aid under AS 47.10.011(6).[3]

According to Raymond Edwards, Shelly's OCS social worker, Shelly initially appeared to be making good progress toward reunification. In April 2010 Shelly participated in a psychological evaluation with Dr. Melinda Glass and began therapy.

---

[1]    We use pseudonyms for all family members.

[2]    25 U.S.C. §§ 1901-1963 (2006).

[3]    AS 47.10.011(6) allows a trial court to find a child to be in need of aid if "the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to supervise the child adequately."

She participated in parenting classes and domestic violence victim groups and was consistent in visiting her daughters. A case plan drafted in June 2010 called for Shelly to engage in weekly mental health counseling, parenting classes, and in-home services, and it noted that a trial home visit was to begin shortly.

Soon after this plan was drafted, Shelly was indicted on criminal charges in connection with Katie's injuries, and the trial home visit was cancelled. Edwards testified that at that time Shelly stopped cooperating with OCS and ceased participating in services. He testified that he later learned of events that occurred during the time he thought Shelly had been progressing toward reunification that caused him to conclude that she had not been doing as well as he thought, but instead had been dishonest and had withheld important information from him.

Edwards was specifically concerned about Shelly's drinking and her involvement in domestic violence. Several incidents involving heavy drinking and fighting occurred between April 2010 and July 2012. Shelly was arrested several times during this period on charges of assault, domestic violence assault, and family violence. The incidents all involved alcohol. Children were present during several of the incidents. While numerous incidents involved physical violence between Shelly and her boyfriend, Shelly testified that their relationship was healthy and was not violent, because, according to Shelly, the two were "not constantly doing domestic violence."

The first of the troubling incidents that resulted in Shelly's being arrested occurred during a two-week interlude between interviews that Dr. Glass conducted with Shelly as part of her psychological evaluation. Although Dr. Glass had asked Shelly about her arrest record and her history of involvement with law enforcement at the initial interview, during the second interview Shelly did not tell Dr. Glass about the intervening

arrest.[4] Dr. Glass testified that Shelly's decision to withhold this information concerned her, and she noted that Shelly's lack of candor made it "impossible to give a clear diagnosis or a clear understanding of what's happening with her." Shelly's history caused Dr. Glass to suspect substance abuse might have been an issue for her, but because Shelly "denied everything" during her evaluation, Dr. Glass did not diagnose Shelly with a substance abuse problem.

In March 2011, following an incident of intoxicated domestic violence, OCS updated Shelly's case plan to include substance abuse services. The updated plan noted that while substance abuse had not been identified as a safety threat when the children were taken into custody, recent events revealed Shelly's alcohol abuse to be a source of concern. The updated plan called for Shelly to participate in a substance abuse assessment at Alaska Family Services, but Shelly did not appear for the assessment. The plan also called for Shelly to participate in random urinalysis testing. By the time of the termination trial — more than a year after the requirement was added to her plan — Shelly had participated in only five such tests; she began to participate only when ordered to do so in her criminal case.

More than a year after substance abuse services were added to Shelly's case plan, Shelly made an appointment for an assessment with a provider other than the one specified by OCS — possibly after having been ordered to do so in her criminal case. She did not tell OCS about the appointment, so OCS was unable to provide the assessor with relevant collateral information about her history. Edwards testified that if Shelly had told him about the upcoming assessment, OCS would have provided appropriate

---

[4]     Dr. Glass testified that she generally does not repeat each question from an initial interview during the second session, but that she would expect a client to volunteer information about an arrest that occurred between the two interviews. Shelly also did not tell OCS or her mental health counselor about the incident.

collateral information and would have paid for the assessment. Following the assessment Shelly began substance abuse treatment on an outpatient basis, but even then she refused to acknowledge that she had a significant drinking problem.

In addition to adding substance abuse services, the March 2011 case plan noted that Shelly had not continued with the mental health counseling she had begun. In May 2011 the trial court granted Katie and Daisy's guardian ad litem's motion to require Shelly to participate in an updated psychological evaluation with Dr. Glass. Shelly did not comply, despite acknowledging that the court had ordered her to do so. She testified that she refused to complete the follow-up evaluation because she "had distrust in [Dr. Glass] after reading her first evaluation." Shortly before the termination trial Shelly again began attending therapy sessions.[5]

Thus, at the time of the termination trial Shelly had begun participating in outpatient substance abuse treatment and had reengaged in mental health counseling, although the substance abuse treatment was based on an inadequate assessment and the mental health counseling was insufficient to satisfy Dr. Glass's recommendation. In addition, Shelly had completed parenting classes in 2009, but she acknowledged that she needed to complete another round of classes. Regarding Shelly's failure to adequately engage in services throughout the life of the case, Edwards testified:

> [W]hat's really disturbing is the fact that she refused to do anything about the substance abuse, about the drinking, and it appears to me that she didn't even attempt to go do an assessment until after she was arrested again in June and there were conditions added that she would go get an assessment and do treatment and stay out [of] jail, but she wouldn't do the same thing to try to get her kids back.

---

[5]    Shelly testified that she was enrolled in an eight-week program of sessions. Dr. Glass's opinion was that Shelly's therapy would take much longer: "[T]he treatment I'm recommending takes a year or two. It's not quick. It's long-term treatment."

## B. Proceedings

On May 10, 2011, OCS petitioned to terminate Shelly's parental rights to Katie and Daisy. The trial was continued several times, in part because the trial court was concerned about potential Fifth Amendment issues and wished to allow Shelly's criminal proceedings to be resolved before the termination trial. Eventually the termination trial went forward based solely on circumstances and conduct that had occurred after the children had been taken into OCS's custody, thus eliminating any overlap in evidence between Shelly's criminal case and the termination trial. Following the trial the superior court terminated Shelly's parental rights to Katie and Daisy based on a risk of mental harm due to exposure to domestic violence, Shelly's substance abuse issues, and Shelly's mental health issues.[6] Shelly appeals, challenging only the trial court's finding that OCS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of her family.

## III. STANDARD OF REVIEW

Whether OCS made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of an Indian family is a mixed question of law and fact.[7] We review legal questions de novo.[8] We affirm

---

[6] We note that there is no requirement that the conduct upon which a trial court bases its decision to terminate parental rights be the same conduct that initially resulted in the children being taken into state custody. *Jeff A.C., Jr. v. State*, 117 P.3d 697, 703 (Alaska 2005).

[7] *J.S. v. State*, 50 P.3d 388, 391 (Alaska 2002) (citing *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 259 (Alaska 1999)).

[8] *Id.* (citing *A.A.*, 982 P.2d at 259).

factual findings unless they are clearly erroneous.[9] A finding is clearly erroneous if, after reviewing the entire record, we have a definite and firm conviction that the finding is mistaken.[10]

## IV.    DISCUSSION

### The Trial Court Did Not Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Indian Family.

Before the trial court may terminate a parent's parental rights to an Indian child 25 U.S.C. §1912(d) and Alaska Child in Need of Aid Rule 18(c)(2) require the court to find, by clear and convincing evidence, that OCS made active but unsuccessful efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.  Courts review the adequacy of OCS's reunification efforts on a case-by-case-basis.[11]  Generally, active efforts entail a social worker taking a parent through the steps of a reunification case plan, rather than simply devising a plan and requiring the parent to develop his or her own resources.[12]  In determining whether active efforts have been made, a court need not focus on a distinct period of time, but may consider all services provided during the family's involvement with OCS.[13]  Efforts need

---

[9]     *Id.*

[10]    *Id.* (citing *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993)).

[11]    *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 856 (Alaska 2013) (citing *A.A.*, 982 P.2d at 261).

[12]    *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010) (quoting *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008)).

[13]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008) (quoting *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

not be perfect to satisfy ICWA's requirements,[14] and, of particular relevance to the present case, a parent's demonstrated unwillingness to participate in services may be considered in determining whether OCS's efforts were sufficient.[15]

Shelly does not allege that OCS failed to make extensive efforts to provide her with reunification services. Those efforts included facilitation of visits between Shelly and the girls; assistance in attending the girls' medical appointments; provision of comprehensive parenting classes and parent coaching; provision of a psychological evaluation and encouragement to participate in a follow-up evaluation; referrals to mental health counseling, domestic violence victim groups, a comprehensive parenting program, a family support and preservation program, multiple substance abuse assessments and urinalysis testing; provision of in-home services to help Shelly prepare for a trial home visit; attempts to help her develop a relationship with Katie's therapist in order that family therapy might begin; provision of bus passes; invitations to participate in team decision-making meetings and administrative reviews; and extensive, continuous communication with Shelly and with various service providers.[16]

Despite having been offered these services, Shelly argues that OCS's efforts were insufficient because OCS did not include certain additional services in her case plan. She asserts that her plan was inadequate because (1) its referral to mental health

---

[14] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[15] *Maisy W.*, 175 P.3d at 1268 (quoting *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001)).

[16] In addition, OCS made extensive efforts for Katie and Daisy, including providing medical care, occupational and physical therapy, developmental assessments, infant learning assessments, mental health counseling, in-home services, and visitation with Shelly.

counseling was generic, rather than specifically naming dialectical behavior therapy, which was the type of therapy that Dr. Glass recommended; (2) it did not include an anger management component, despite OCS's awareness that Shelly had been a perpetrator of domestic violence; and (3) it did not include family counseling, despite the testimony of Katie's therapist that visits between Shelly and Katie had gone well and that her usual practice was to include parents or foster parents of a child of Katie's age in the child's therapy sessions.

But Shelly refused to participate in almost all of the services offered to her. Early in the case, Shelly attended some of the domestic violence classes and counseling sessions to which she was referred by OCS, but she quickly ceased participating meaningfully in any of the services offered to her. Edwards described numerous incidents throughout the case of Shelly's refusal to cooperate with OCS, including not providing OCS with truthful information in June 2010, not attending counseling in October 2010, not picking up bus passes in October 2010, not progressing in a family support and preservation program in December 2010, inconsistently attending counseling in December 2010, refusing to engage in her case plan in January 2011, refusing substance abuse services in March 2011, refusing to communicate with OCS in June 2011, refusing a substance abuse assessment in July 2011, refusing to update her psychological evaluation in August 2011, refusing to engage in her case plan services in February 2012, not appearing at a team decision-making meeting in June 2012, not responding to OCS's request that she sign releases of information for mental health and substance abuse assessments in June 2012, and not responding to Katie's therapist's request for a case-planning meeting in June 2012. Visitation was the only element of Shelly's case plan that she appears to have consistently participated in between June 2010 and the months just before the termination trial.

Shelly points to nothing in the record to indicate that she would have engaged in additional services if OCS had amended her case plan to include them. Indeed, the record indicates she would not have. While OCS did not specifically name dialectical behavior therapy in Shelly's case plan, the therapy Shelly briefly participated in on OCS's referral was in conformity with Dr. Glass's recommendation. And Shelly's refusal to acknowledge the violent aspect of her relationship with her boyfriend indicates that she would not have been motivated to engage in anger management counseling. Also, Edwards testified that he "asked [Shelly] about the DV arrest . . . and her response to [him] even two years ago was it had nothing to do with her case and so she wasn't going to do anything about that. She . . . wasn't interested in any of those kind of services." And even if family therapy had been included in Shelly's case plan, it could not have occurred in time to affect her case, because Katie's therapist testified that neither Katie nor Shelly was ready for family therapy. And even if the additional services had been added to Shelly's case plan and she completed them, the dangers posed to the children by her substance abuse issues, upon which the trial court partially based its termination decision, would have remained unresolved.

Shelly refused to participate meaningfully in the abundant services offered to help her reunify her family. She offers no evidence to indicate that provision of additional services would have made a difference in her case. The trial court characterized OCS's efforts as "exhaustive," when viewed in light of Shelly's level of cooperation. We agree. We therefore affirm the trial court's finding that OCS made active reunification efforts for Shelly's family.

## V. CONCLUSION

For the reasons stated, the trial court's order terminating Shelly's parental rights to Katie and Daisy is AFFIRMED.