STOWERS, Justice,
dissenting in part.
Prologue
The Office of Children's Services retained psychologist Dr. Melinda Glass to evaluate Grace L.'s mental health problems and to make recommendations for what needed to be done to assist Grace in becoming a safe parent and regaining custody of her son. Dr. Glass recommended:
If there were any hope of returning her son to her, ongoing oversight would be necessary, as well as ... an evaluation for medication, and compliance with recommended medication and treatment. Mental health therapy would need to occur on a regular basis with the focus upon developing a more grounded perception, resolving underlying traums, and addressing her delusional system.
I.
This appeal involves the superior court's termination of a mother's parental rights to her Indian child. Thus this Child In Need of Aid case is governed by the Indian Child Welfare Act (ICWA).[1] Under ICWA, the *990 superior court may not terminate a parent's parental rights to an Indian child unless it finds, by clear and convincing evidence, that the State made active efforts to provide services and programs designed to prevent the breakup of the Indian family.[2] ICWA seetion 1912(d) provides:
Any party seeking to effect a ... termination of parental rights to[] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
"No 'pat formula' exists for distinguishing between active and passive efforts, and we have adopted a case-by-case approach for the active efforts analysis."[3] But we have repeatedly recognized that efforts are passive "where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition."[4] In contrast, efforts may be termed active when "the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own."[5] As an example, "rather than requiring that a client find a job [and] acquire new housing, ... the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child."[6]
T disagree with the court's opinion concluding that the superior court did not err when it determined that the Office of Children's Services (OCS) made active reunification efforts. I conclude that OCS failed to make active efforts under a clear and convincing burden of proof. This being the case, I also conclude that the superior court's order terminating Grace's parental rights should be reversed and the case remanded for OCS to make the active efforts that ICWA requires.[7]
When OCS refers a parent with mental health problems like Grace to a mental *991 health professional for an evaluation, it does so for a variety of reasons. One of the most important reasons is to gain an understanding of exactly what the parent's mental health problems are and what can be done to treat them. The mental health professional often will make critical recommendations for further assessment and treatment, and OCS will (or should) include these recommendations in the parent's case plan. Developing an appropriate case plan is crucial for the parent to know what she must do in order to maximize the possibility of reunifying with her child. Developing an appropriate case plan based on the recommendations is also crucial for OCS to demonstrate that it has made active efforts under ICWA.
In this case, OCS failed to comply with the recommendations of its retained mental health professionals-namely, to refer Grace to a psychiatrist for medication assessment and management of her delusional disorder, and to closely monitor her therapy to ensure that the therapist was actually providing therapy "with a focus upon ... addressing her delusional system." Because OCS failed to make these efforts, in the words of Dr. Glass, Grace had no hope of having her son returned to her.
IL
OCS took emergency custody of Ronnie on July 31, 2009. The following month, OCS referred Grace for an assessment with clinical psychologist Dr. Grace Long, who recommended that Grace continue in therapy and be evaluated by a psychiatrist to determine if medication would be appropriate for her.
On February 28, 2010, Grace was seen by Dr. Tim Harvey at Southcentral Foundation's Behavioral Services clinic. The court today places much emphasis on this visit with Dr. Harvey, relying on it to support its erroneous conclusion that OCS satisfied its active efforts obligation to make a referral to a psychiatrist for medication management. I therefore quote from Dr. Harvey's report in some detail and ask the reader to pay close attention to exactly what Dr. Harvey said. According to Dr. Harvey's evaluation report, Grace explained that "OCS wanted me to see a psychiatrist regarding custody of my child." Dr. Harvey elaborated:
The patient presents today for medication evaluation in the clinic for somewhat unclear reasons....
The patient is somewhat reticent to discuss her psychiatric history today and indicates that she feels that she has no psychiatric problems at the present time requiring treatment.... Once again she indicates that she is only presenting today somehow at the behest of OCS or others involved with the custody proceedings.
In his Clinical Summary, Dr. Harvey stated:
This is a patient with an apparent history of delusional disorder versus possible schizophrenia who is presenting today apparently primarily for procedural reasons relating to an apparent custody case regarding her youngest child. The patient is currently in ongoing interpersonal therapy ... but makes it clear that she feels no need for medication intervention in terms of potential psychiatric illness at this time.
In his Recommendations, Dr. Harvey wrote:
I discussed with the patient [] that I do not do psychiatric evaluations for OCS or agencies other than [Southcentral Foundation] at the present time. I urged her to speak with her attorney or other representatives if she should have further questions about her custody case. It appears that she has significant symptoms consistent with a possible delusional disorder or possible other psychiatric disorder including schizophrenia in the past but does not present with complaints particularly consistent with this today. She also makes it clear that she is not seeking medication treatment for any psychiatric disorders at the present time.
Several things become immediately clear from Dr. Harvey's report. It is evident that OCS did not contact Dr. Harvey or provide him with any information about Grace or the reason OCS wanted her to be evaluated by him. Had OCS done so, Dr. Harvey would certainly have referenced this collateral information, and he would not have been so reliant on his delusional patient's self-reporting or so uncertain about why she came to him. It is also significant that Dr. Harvey *992 clearly stated that he does not "do psychiatric evaluations for OCS." It may be inferred that OCS told Grace to go see Dr. Harvey for a medication evaluation, though a mere referral would not have satisfied OCS's active efforts obligation. But under these cireum-stances, where Dr. Harvey had no clear idea what he was being asked to do, and where he was plainly not in the business of working on OCS matters, surely this referral, if a referral it was, cannot constitute clear and convincing evidence that OCS met its active efforts obligation to refer Grace for a psychiatric medication assessment.[8]
It is also highly significant that at the termination trial, OCS did not rely on Dr. Harvey's "assessment" to support its active efforts argument; indeed, OCS never mentioned Dr. Harvey by name during the termination proceedings. And while it is true that Dr. Harvey's report was included within numerous other Southcentral Foundation ree-ords for Grace which were collectively admitted as OCS's trial exhibit 4, no party referred to Dr. Harvey's report either at trial or in argument, and the superior court never mentioned, much less relied on, Dr. Harvey's report for any purpose in its oral and written findings and order terminating Grace's parental rights. In other words, while this court relies heavily on Dr. Harvey's report to save OCS from its obvious failure to follow Dr. Glass's urgent recommendation, neither the parties nor the trial court mentioned Dr. Harvey or his report at any stage of the proceedings below.
In March 2010, after Grace visited Dr. Harvey, she participated in a psychological evaluation with Dr. Melinda H. Glass, to whom OCS had referred her. Dr. Glass interviewed Grace, administered a number of tests, and reviewed collateral information. Dr. Glass diagnosed Grace with "[dJelusional disorder, mixed type, primarily persecutory and grandiose." She noted that Grace started taking medication after completing a psychiatric assessment in 2008, but had stopped taking it within weeks. Dr. Glass concluded that without medication Grace "is likely to experience great difficulty safely and appropriately parenting any child ... and is likely to be unable to provide [Ronnie] with guidance or stability." Dr. Glass then stated:
If there were any hope of returning her son to her, ongoing oversight would be necessary, as well as ongoing in-home parenting services, an evaluation for medication, and compliance with recommended medication and treatment. Mental health therapy would need to occur on a regular basis with the focus upon developing a more grounded perception, resolving underlying trauma, and addressing her delusional system.[9]
Dr. Glass concluded, "[AJs long as [Grace] continues to function with an untreated delusional disorder she has the potential of causing great harm to her son as well as to herself."
Dr. Glass also stated that while it was important for Grace to receive mental health treatment if she were to have a safe and appropriate parenting relationship with Ronnie, her persecutory delusions would likely hinder her ability to participate in treatment. Dr. Glass noted that Grace appeared to have a good relationship with Grace's Southcentral Foundation therapist, Richard Gustafson, who "appears to understand some of her problems." Dr. Glass recommended that Grace continue in therapy and also be referred to a psychiatrist for a medication review and that she take any recommended medication to try to improve her ability to discern reality. Dr. Glass noted that Grace "is unlikely to do this without a court order, and may not even then."
But, having received this recommendation from the expert it retained, OCS failed to refer Grace to a psychiatrist for a medication evaluation.
On May 8, 2012, OCS asked Dr. Glass to conduct an updated psychological evaluation *993 of Grace. Dr. Glass noted that "(treatment does not appear to be helping [Grace] address her mental illness and it is not known whether medication would have a significant impact. - It is unlikely [Grace] would consider it as she has refused medication in the past." Dr. Glass concluded that "a psychiatric evaluation to rule out a mood disorder and consider the usefulness for medication is still recommended." (Emphasis added.) Yet again, OCS did not act on this recommendation.[10]
IIL
Compounding its failure to make a real referral to a psychiatrist for medication and treatment, OCS also failed to monitor to any significant degree Grace's progress in therapy.[11] Grace's Southcentral Foundation Behavioral Health therapist Gustafson testified at the termination trial that he worked with Grace to enhance her ability to function in the world, but that he did not attempt to ameliorate her underlying delusions.[12] He was clear that his intent in therapy was to help Grace alleviate the anxiety she experienced as a result of her mental issues, not to address what Dr. Glass referred to as Grace's "delusional system." The trial court paraphrased Gustafson's goal to be "not so much [addressing] the cognitive element of identifying whether something is delusional or not but dealing with the sort of ramifications, the anxiety that flows from the perceptions she has and the behaviors that flow from the perception she has." Gustafson agreed with this summary. He admitted that "[he was] not sure what the criteria are[] exactly" for delusional disorder, and would "have to go with whatever the DSM says."
Had OCS actively monitored, to any degree, Grace's treatment with Gustafson, it would have easily seen that his therapy did not have the recommended "focus upon ... addressing her delusional system." But OCS and Gustafson had no meaningful contact before the termination trial.
IV.
As noted earlier, a trial court may not terminate a parent's parental rights to an Indian child unless it finds, by clear and convincing evidence, that the State made active efforts to provide services and programs designed to prevent the breakup of the Indian family.[13] The trial court made that finding here, specifically explaining that OCS's efforts included providing Grace with visita *994 tion, assessments, transportation assistance, referrals for counseling, contact with Grace's counselor, and meetings with OCS. I disagree: OCS breached its duty to Grace by not referring her for a psychiatric/medication evaluation as Dr. Glass recommended, by not monitoring to any practical extent the kind of therapy Gustafson was providing, and by not referring Grace to a therapist who could provide the kind of therapy identified as necessary by Dr. Glass.
The trial court noted that while Gustaf-son's goal was not to eradicate Grace's underlying delusional disorder, counseling with Gustafson "was free for [Grace], easy to get to, and most importantly [Grace] trusted him and had worked with him for years. This was an important relationship for [Grace]." I agree with the trial court and with Dr. Hass that participating in counseling, particularly in counseling with Gustafson-with whom Grace had an established relationship-was important for Grace. But I also believe that OCS was required to do more to monitor her progress in counseling.[14] Had OCS done so, it would have realized that Gustafson's objective was not to treat Grace's delusions but to help her function in spite of being delusional.[15] In failing to reset the focus of her treatment with Gustafson to ensure that Grace received the recommended counseling targeted at her delusional system or to refer Grace to another therapist who could foeus therapy on Grace's underlying delusional disorder, OCS failed to make active efforts.
OCS referred Grace for three different evaluations: one mental health assessment with Dr. Long, and two psychological evaluations with Dr. Cass. Both Dr. Long and Dr. Glass specifically recommended that Grace receive an evaluation by a psychiatrist for medication - management. - As explained above, and contrary to the court's erroneous post facto justification, the assessment by Dr. Harvey at Southcentral Foundation could not have counted as OCS's referral for psychiatric medication assessment and treatment if for no other reason than because Dr. Harvey stated that he did not do psychiatric assessments for OCS. And Dr. Glass could not have been clearer when she recommended, gaffer Grace saw Dr. Harvey, "If there were any hope of returning her son to her, ongoing oversight would be necessary, as well as ... an evaluation for medication." OCS ignored these recommendations.
This is not a case where I can conclude that OCS's efforts over the course of the entire case were active; here, OCS failed to make any real effort to address Grace's critical needs that were identified by the very mental health care experts that OCS selected to guide it in preparing a case plan to identify what efforts it needed to actively make. And this is not one of those cases where OCS can survive a serious active efforts challenge by pointing to the parent's co-failure to participate in her case plan. Here, Grace was complimented by Gustafson for making, or making up, every counseling session,[16] and *995 OCS did not dispute that Grace satisfied the other elements of her case plan (housing and visitation with Ronnie).[17] Of course, Grace could not have satisfied the psychiatric medication part of her case plan because OCS failed to make that referral. And there was no testimony by any OCS caseworker that the worker spoke with Grace and urged her to obtain a psychiatric medication assessment or consider taking medication for her delusional disorder.
For these reasons I would hold that the trial court erred in concluding under a clear and convincing evidentiary standard that OCS's actions toward Grace amounted to "active efforts ... to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[18] I would reverse the trial court's order terminating Grace's parental rights and remand so that OCS can make active efforts as recommended by Dr. Glass and required by the Indian Child Welfare Act.

. 25 U.S.C. §§ 1901-1923 (2012).

. 25 U.S.C. §1912(d) (2012) CINA Rule 18(c)(2)(B).

. Josh L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 276 P.3d 457, 466 (Alaska 2012) (quoting Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 249 P.3d 264, 271 (Alaska 2011)).

. AA. v. State, Dep't of Family & Youth Servs., 982 P.2d 256, 261 (Alaska 1999) (quoting Craic J. Dorsay, THs Inpran Cuito Werrare Act anp Laws Arrectinc Inptan Juvenites Manuat 157-58 (1984)); see also Dale H. v. State, Dep't of Health & Soc. Servs., 235 P.3d 203, 213 (Alaska 2010); Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 212 P.3d 756, 763 (Alaska 2009); A.M. v. State, 945 P.2d 296, 306 (Alaska 1997).

. AA., 982 P.2d at 261 (quoting Dorsav, supra note 4, at 157-58).

.Id.

. Because I conclude that OCS failed to make active efforts, I also necessarily conclude that it was error to find that Grace failed to timely remedy the conduct or conditions that made her son a child in need of aid. And because it is premature to find that termination of a parent's parental rights is in the best interest of the child where OCS fails to make active efforts, I disagree with this finding also. I concur with the court's opinion that the superior court's finding that Ronnie is a child in need of aid was not error, and that the superior court properly considered Grace's claim of ineffective assistance of counsel.
I also disagree to a point with the superior court's refusal to consider Grace's request for an order for post-termination visitation. The court explained: "It is very unfortunate ... to me that the current law does not allow a judge to order termination but also order ongoing contact. I really wish I had that option, because I would certainly order it here, but I don't have that option." - We stated in Ralph H. v. State, Department of Health and Social Services, Office of Children's Services:
After a trial court terminates parental rights, the parent retains no residual parental rights to the child. Although there is no CINA statute that expressly grants the superior court the authority to order post-termination visitation, we have not foreclosed the possibility that the superior court could authorize post-termination visitation in "extraordinary circumstances." In such circumstances, post-termination visitation will only be permitted "to the extent that the authorized visitation is in the best interest of the child."
255 P.3d 1003, 1014 (Alaska 2011) (quoting Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 162 P.3d 1239, 1248 (Alaska 2007); C.W. v. State, Dep't of Health & Soc. Servs., 23 P.3d 52, 58 (Alaska 2001)) (footnote omitted). In my view, of all the cases where this court has considered the question of post-termination visitation, if a trial court may order such visitation (an unresolved legal question), this case would likely satisfy the criteria of "extraordinary circumstances."

. For efforts to be active, "the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own." A.A., 982 P.2d at 261 (quoting Dorsay, supra note 4, at 157-58).

. These critical needs-ongoing oversight, psychiatric medication referral, and ongoing therapy focused on Grace's delusional disorder-are the areas where OCS utterly failed to make active efforts.

. If one were cynical, one might conclude that in asking Dr. Glass to conduct a follow-up assessment, OCS was more interested in generating evidence to support its petition to terminate Grace's parental rights than in making active efforts towards reunifying Grace with her son. OCS filed its petition to terminate Grace's parental rights on January 6, 2012. OCS had Dr. Glass reassess Grace on May 3. The termination trial commenced on May 21. It would be disingenuous for OCS to argue that this eleventh hour, follow-up assessment by Dr. Glass should count as an active effort; it would be error for the court to consider it an active effort.

. Cynthia Robinson was the only OCS caseworker to testify at the termination trial. She stated that she was assigned to Grace's case on October 1, 2011. She was asked at trial whether she had been in contact with Gustafson since being assigned to the case, and she answered, "I did just briefly, not telephonically, but there was an email sent to me." - She was not asked whether other caseworkers had any discussions or communications with Gustafson about his therapy sessions with Grace. Robinson answered "yes" when asked whether "the department over various times contacted him for updates." Presumably she was referring to OCS's obtaining copies of his notes of therapy sessions with Grace. There is nothing in the record to indicate that OCS and Gustafson were in direct contact or what the content of any communications may have been. Nor does the record disclose that OCS took any action in response to communications it may have received from Gustafson. What is absolutely clear is that OCS was unaware until Gustafson testified at the termination trial that he did not see that his role was to treat Grace's underlying delusional disorder; rather, he saw his role to be treating Grace's anxiety symptoms.

. Although Gustafson's notes indicate that one of his objectives in treatment was to have Grace identify delusional situations and use behavioral techniques to prevent delusional anxiety, Gustaf-son explained that he did not attempt to challenge Grace's delusions. He also testified that most of the progress Grace had achieved through therapy had to do with her ability to control her hostility and agitation and to express herself in an appropriate manner.

. 25 U.S.C. §1912(d) (2012); CINA Rule 18(c)(2)(B).

. One of the efforts the trial court credited OCS with having made was "maintaining contact with a counselor on ongoing issues." My review of the record indicates that such contact was minimal, as I previously demonstrated in note 11, and was certainly not acted on by OCS in any meaningful way. Had OCS actually engaged in monitoring Gustafson's counseling with Grace, it would have discovered long before the termination trial that Gustafson did not see his role as providing therapy focused on addressing Grace's delusions.
Indeed, the trial court seemed flabbergasted after Gustafson testified; the court was surprised that Gustafson had not been focusing on Grace's underlying delusions, and it commented that Gustafson "had nothing of use to say about her delusional disorder. At all." In colloquy with the Guardian ad Litem following the conclusion of Gustafson's testimony, the court stated, "I guess, Ms. Skoog-Moore, you'd identified that perhaps the counselor [Gustafson] could give us some sense on how deep-seated this disorder is, and I don't think-I really don't think he cares." Skoog-Moore replied, "I don't think he thinks he's qualified obviously to go into delusional. Is what I got out of [Gustafson's testimony]."

. In her follow-up evaluation, Dr. Glass noted that, while Grace had continued in treatment with Gustafson, the treatment "does not appear to be causing an improvement in her functioning." Again, this is not surprising since Gustaf-son was treating Grace's anxiety symptoms and helping her cope with the effects of her delusional disorder, not treating the underlying disorder itself.

. Gustafson testified that the "only reason she misses [a counseling session} actually is if I'm not there. And even in those cases, she'll ... *995 double up at some point." He went so far as to state, ''I'd almost bet my money on if she missed it was because ... I was gone for family leave."

. Unrebutted testimony indicated that Grace had found stable housing in Eagle River, was attending all supervised visitation with Ronnie, and was consistently attending counseling with Gustafson.

. 25 U.S.C. § 1912(d) (2012).