*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CLAUDIO P., | ) | |
| | ) | Supreme Court No. S-14988 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-10-00090 CN |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 6827 – September 20, 2013 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Jacqueline G. Schafer, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

BOLGER, Justice.

## I. INTRODUCTION

The father in this case, Claudio P., has been incarcerated since before his daughter, Iris, was born and is likely to remain incarcerated for a significant portion of Iris's childhood.[1] Iris was taken into State custody in June 2010 due to her mother's substance abuse and unsafe conditions in her home. Claudio's mother requested that Iris be placed with her, but her lack of stable housing precluded that possibility until January 2012 when she found a permanent home in Texas. In October 2011 Claudio also provided the name of his father, who lives in South Dakota, as another placement option. OCS requested home studies under the Interstate Compact on the Placement of Children (ICPC)[2] for each of Claudio's parents. Both home studies came back with positive recommendations shortly before the termination trial, which was held in August 2012. Following the trial, the trial court terminated Claudio's parental rights to Iris and noted that Iris's permanent placement would be determined at a subsequent hearing.

Claudio argues that the trial court erred by terminating his rights because OCS should have taken more action to place Iris with one of his parents. But we conclude that OCS's investigation of Claudio's placement request was reasonable and timely, and that each of the trial court's challenged findings is supported by substantial evidence.

## II. FACTS AND PROCEEDINGS

### A. Iris Is Taken Into OCS's Custody In June 2010.

Claudio has twice been convicted and incarcerated for manslaughter — from April 1994 to November 2004, and from January 2006 to the present. In the

---

[1] Pseudonyms are used throughout to protect the privacy of the parties.

[2] AS 47.70.010-.080.

interim he fathered a child, Iris, with Sandy.[3]  Claudio was in prison in May 2006, when Iris was born.  He expects to be released in 2015 or 2016.

Iris has twice been in OCS's custody.  The first time, beginning in 2008, was due to Sandy's problems with substance abuse and her neglect of Iris.  OCS referred Sandy to substance abuse treatment, which she successfully completed.  Iris was returned to Sandy in 2009, and the OCS case was closed.

In early 2010 OCS began receiving reports about Sandy and her children.[4]  In June 2010, after Sandy was arrested for DUI, she voluntarily placed Iris and Dolores into State custody.  At Sandy's request OCS placed the children with the Normans, licensed foster parents who had cared for Iris during her earlier time in OCS's custody.  Sandy had a close relationship with the Normans, who were present at the birth of her children and who had adopted a close relative of Sandy's.

**B.**    **OCS Makes Reunification Efforts Primarily For Sandy; Claudio Participates In Services While Incarcerated.**

OCS's efforts before 2012 were directed mainly at Sandy.  OCS referred Sandy to Tanana Chiefs Conference Behavioral Health Service for an assessment, it referred her to Ralph Perdue Center and to Fairbanks Native Association for case management services, it set her up to participate in urinalysis testing, it assisted her in obtaining housing, it referred her to parenting classes at the Resource Center for Parents and Children family reunification program, and it offered to transport her from Minto to Fairbanks for visits with her daughters.

---

[3]    Iris is an Indian child for purposes of the Indian Child Welfare Act (ICWA).  25 U.S.C. §§ 1901-1963 (2006).  She and Sandy are members of the Native Village of Minto.

[4]    In March 2010 Sandy had a second daughter, Dolores.

OCS did not offer many services to Claudio. Social worker William Downes testified that providing services to Claudio was difficult because of his incarceration. Downes testified that he was unable to call Claudio or send emails to him in prison. He stated that during case review meetings that Claudio attended telephonically, he stressed to Claudio the importance of communicating with OCS. However, Claudio never initiated communications. While incarcerated, Claudio participated in a program offered by the Department of Corrections that, according to Claudio, addressed anger management and thinking errors.

OCS facilitated contact between Iris and Claudio, although actual visits did not occur until late in the case. Downes testified that he began contact slowly, by means of letters, cards, and pictures, because of bonding issues that Iris had exhibited. He testified that as the case progressed his supervisor directed him to "get going on" implementing visitation between Iris and Claudio. In the months leading up to the termination trial, OCS facilitated three in-person visits between Iris and Claudio at the Palmer Correctional Center. The visits, which were paid for by OCS, occurred monthly. Downes testified that arranging visits for Iris at Palmer was difficult because the visits took a full day for the child, who lived in Fairbanks, involved plane travel, and required that a familiar adult accompany her.

### C. Claudio's Mother Requests Placement But Does Not Acquire Stable Housing Until January 2012.

Claudio's mother, Celina, retired from her job and left Alaska in August 2010. She did not learn that Iris had been removed from Sandy's custody until October or November 2010. In summer 2011 Celina temporarily returned to Alaska, where she stayed with her daughter in Fairbanks and worked in Livengood. The record does not indicate that she requested placement at the time, and, in any event, her daughter's home

was not large enough to accommodate Iris and Dolores.[5]  OCS provided Celina with in-person visits with the girls during this time but Celina's unpredictable work schedule made organizing visits difficult.  Telephone visits were not possible at Celina's workplace.  At some point during the summer or fall, Celina left Alaska, moving briefly to Arizona, where she house-sat, and then, in September 2011, to Texas.  In January 2012 she bought a house in Texas.

Celina had told OCS that she did not want a home study done for Iris until she acquired stable housing, but she stated that she would be willing to care for Iris.  In March 2012, after learning that Celina had obtained stable housing, OCS requested an ICPC home study to investigate whether Iris and Dolores could safely be placed with her.  Texas approved the placement in July 2012 and forwarded a favorable report to OCS the following month, shortly before the trial on the petition to terminate Claudio's parental rights.

**D.     Sandy Announces Her Intention To Relinquish Her Parental Rights; Claudio Provides OCS With Suggestions For Placement.**

In late August 2011 Sandy stated that she intended to relinquish her parental rights to her daughters.  Claudio then provided his attorney with names of relatives, including his mother and his siblings, whom he suggested as placement options.  Celina was not then available for placement, as she had yet to acquire stable housing.  Downes testified that when he received the names of Claudio's suggested placements, he contacted Claudio's sister in October 2011 and his brother in January 2012.

Claudio's father, Paulo, testified that Claudio first told him that Iris was in OCS's custody in October 2011.  That month, Downes contacted Paulo and he initiated

---

[5]     OCS's policy is to place siblings together, whenever possible, in order to maintain their sibling bond.

an ICPC home study for Paulo's family in South Dakota. OCS had just received the positive result of the home study at the time the termination trial began.

In addition to visits with Claudio, OCS facilitated weekly visits, initially by telephone and later by video conferencing, between Iris and Paulo's family. At the time of the termination trial, OCS intended to set up an in-person visit. It appears that OCS also intended to facilitate visits with Celina, but for reasons not apparent in the record, those visits did not occur.

At the time of the termination trial Iris's permanent placement had yet to be determined. The trial court noted that her permanent placement would be decided in future proceedings.

**E.      The Trial Court Terminates Claudio's Parental Rights To Iris.**

In March 2012 OCS filed a petition to terminate Sandy's and Claudio's parental rights to Iris. Sandy then relinquished her rights. In August 2012 a termination trial was held with respect to Claudio's rights. Witnesses included Claudio, Paulo, Celina, and Downes, as well as Cynthia Bridgman, a clinical therapist who had provided services to Iris, and who testified as an expert in evaluating and providing therapeutic services to children who have experienced trauma and to children who have relationship and adjustment disorders. The Native Village of Minto intervened in the case in October 2010, and participated in the trial.

On November 29, 2012, the trial court issued an order terminating Claudio's parental rights. The court found Iris to be a child in need of aid under AS 47.10.080(o) and AS 47.10.011(2), (6), and (8).[6] The court found that Claudio had not

---

[6]      AS 47.10.080(o) and AS 47.10.011(2) allow a court to find a child to be in need of aid based on her parent's incarceration. AS 47.10.011(6) allows a court to find a child to be in need of aid based on the child's having been physically harmed or placed

(continued...)

remedied the conduct that placed Iris at risk of harm, that OCS had made active but unsuccessful efforts to provide services to prevent the breakup of the Indian family, that Claudio's continued custody of Iris would likely result in Iris suffering serious emotional or physical damage, and that termination of Claudio's parental rights was in Iris's best interests.

Claudio appealed, challenging the trial court's findings that Iris is a child in need of aid, that OCS made active efforts to provide services to prevent the family's breakup, and that termination of his parental rights was in Iris's best interests.

## III.  STANDARD OF REVIEW

In child in need of aid cases we review a trial court's factual findings for clear error.[7]  We review questions of law de novo.[8]  Findings are clearly erroneous if review of the entire record leaves us with "a definite and firm conviction that a mistake has been made."[9]  Conflicting evidence is generally insufficient to overturn the trial court, and we will not reweigh evidence when the record provides clear support for the trial court's ruling.[10]  Whether a child is in need of aid[11] and whether termination of

---

[6](...continued)
at risk of such harm, and AS 47.10.011(8) allows a court to find a child to be in need of aid based on the child's having suffered mental injury or having been placed at risk of such injury.

[7]     *Sherman B. v. State, Dep't of Health & Soc. Servs.*,  290 P.3d 421, 427-28 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health & Soc. Servs.*, 254 P.3d 1095, 1103 (Alaska 2011)).

[8]     *Id.* at 428 (citing *Christina J.*, 254 P.3d at 1104).

[9]     *Id.* at 427-28 (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[10]     *Id.* at 428 (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs.*, 175 (continued...)

parental rights is in a child's best interests[12] are factual findings. The trial court's determination as to whether the State made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family is a mixed question of fact and law.[13]

## IV.    DISCUSSION

### A.    Claudio's Incarceration Rendered Iris A Child In Need Of Aid.

Alaska Statute 47.10.088(a)(1) requires a trial court to find by clear and convincing evidence that a child has been subjected to conduct or conditions described in AS 47.10.011 before the court may terminate a parent's parental rights. The trial court found that Iris was in need of aid under AS 47.10.011(2) and AS 47.10.080(o).[14]

Alaska Statute 47.10.011(2) provides that a child may be found to be in need of aid if "a parent, guardian, or custodian is incarcerated, the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter, and the incarcerated parent has not made adequate arrangements for the child." Similarly, AS 47.08.080(o) provides that a child may be found to be in need of aid if a parent is scheduled to be incarcerated for a significant period of the child's minority, no other parent is able to care for the child, and the

---

[10](...continued)
P.3d 1263, 1267 (Alaska 2008)).

[11]    *Id.* (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

[12]    *Id.* (citing *Christina J.*, 254 P.3d at 1104).

[13]    *Christina J.*, 254 P.3d at 1104 (citing *Ben M. v. State, Dep't of Health & Soc. Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

[14]    According to its terms, a finding under AS 47.10.080(o) qualifies as a finding under AS 47.10.011.

incarcerated parent has not made "adequate provisions" for the child's care during the period of incarceration. The trial court found that these conditions applied to Iris's situation.[15]

Claudio argues that the trial court's finding was clearly erroneous because he made adequate plans for Iris's care during his incarceration. He asserts that he made such plans before Iris came into the State's custody by telling Sandy that if she needed time away from Iris, she could take Iris to Claudio's mother or sister, and, after Iris came into the State's custody, by telling OCS that he wanted one or the other of his parents to care for the child.[16]

We begin our analysis by noting that for an incarcerated parent to make adequate provisions for a child's care the parent must "take affirmative steps to arrange appropriate and feasible care options independent of department action."[17] Claudio's

---

[15]    While these two statutory sections both involve a parent's incarceration, we have noted that they provide "alternate and independent bases" for termination of a parent's parental rights. *Frank E. v. State, Dep't of Health & Soc. Servs.*, 77 P.3d 715, 717 (Alaska 2003). Both the trial court, in its decision, and Claudio, in his brief on appeal, conflate their analyses of whether Claudio's plans for Iris's care were "adequate" under these two statutory sections. While the two sections differ in certain respects, those differences are not germane to the issue raised in this appeal. We agree with the trial court and Claudio that "adequate provisions" and "adequate arrangements" are synonymous for purposes of the statutes, and that caselaw interpreting one of these provisions may be relevant in construing the other.

[16]    Claudio's assertion that both of his parents "were immediately available and willing to take custody of Iris (and Dolores) and adopt her if necessary," is not supported by the record. Claudio's mother was unavailable to take custody of Iris until she acquired housing, which did not happen until Iris had been in OCS's custody for more than 18 months, and Claudio's father did not emerge as a placement option until Iris had been in OCS's custody for 16 months.

[17]    *Samuel H. v. State, Office of Children's Servs.*, 175 P.3d 1269, 1273
(continued...)

suggestion that Sandy leave Iris with Celina or with Claudio's sister if Sandy felt overwhelmed does not satisfy this test. Claudio admitted that he "didn't make any arrangements" with Celina to step in if Sandy became unable to care for Iris, nor does the record indicate that he approached his sister. Merely suggesting to Sandy that she might leave Iris with Celina or his sister "if you feel you need some time away" does not rise to the level of taking "affirmative steps to arrange appropriate and feasible care options." This is particularly true where Sandy did not, in fact, ask Claudio's mother or his sister to care for Iris, but instead voluntarily placed the children with OCS.

Moving on to Claudio's parents, we begin by noting that we have never decided whether an incarcerated parent's request that a child — already in OCS's custody — be placed with a particular individual constitutes making "adequate arrangements" or "adequate provisions" for the child's care. Nor do we decide that question today. Instead, we hold that Claudio's action in waiting more than a year before taking steps to arrange for Iris's care ultimately rendered the steps that he did take inadequate.

Because of Claudio's delay, more than two years elapsed between the time that Iris was taken into OCS's custody and the time when OCS could have placed the child in accordance with Claudio's wishes.[18] During that interval, according to Iris's therapist, Iris bonded with her foster parents, the Normans, as her protectors and

___

[17](...continued)
(Alaska 2008) (citing *Stanley B. v. State, Div. of Family & Youth Serv.*, 93 P.3d 403, 406 (Alaska 2004)).

[18]    Because both Celina and Paulo live outside Alaska, OCS could not legally place Iris with either of them until it received home studies approving such placements from the states where Celina and Paulo resided. AS 47.70.010. OCS received Celina's favorable home study in July 2012 and Paulo's in August 2012.

helpers.[19] The therapist testified that removing Iris from the Normans' care would "cause strong emotional problems, cognitive issues for [Iris], despite how wonderful the newly-appointed caregivers would be." She stressed the importance of the longevity of Iris's relationship with the Normans, and testified that Iris displayed adverse reactions when confronted with suggestions that the relationship might be disrupted. She testified that if Iris were removed from the Normans's care, she would suffer trauma that would not be reparable.

Had Claudio worked with OCS to have Iris placed with Paulo when she first came into OCS's custody, Iris might have been placed there before her bond with her foster parents became too strong to disrupt, or she might at least have developed a relationship with Paulo and his family that could have allowed her to be safely moved to his custody later.[20] But because Claudio delayed so long in putting OCS in contact with Paulo, these things did not happen, and thus his belated request that OCS place Iris with Paulo did not constitute an "adequate" plan for Iris's care. We affirm the trial court's finding that Iris was a child in need of aid under AS 47.10.011(2) and AS 47.10.080(o).[21]

---

[19] The therapist testified that when Iris began therapy she had exhibited numerous issues, including difficulty sleeping, fearfulness, taking off all of her clothes and lying "stiff as a board" at nap time, and urinating and defecating in her clothing. The therapist testified that Iris had reportedly been sexually abused, displayed symptoms indicating that she may have been physically abused, and that her multiple changes in caregivers early in her life had disrupted her social and emotional development.

[20] The same cannot be said of Celina because she chose to delay acquiring housing that would allow her to have custody of Iris until late in Iris's CINA proceedings.

[21] Our resolution of this issue means that we need not consider Claudio's challenges to the trial court's findings that Iris was also in need of aid under AS

(continued...)

**B.** **OCS Made Active But Unsuccessful Efforts To Provide Services To Prevent The Breakup Of The Indian Family.**

25 U.S.C. §1912 (d) and Alaska Child in Need of Aid Rule 18(c)(2) require a trial court to find, by clear and convincing evidence, that the State made active but unsuccessful efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family before the court may terminate a parent's parental rights to an Indian child. Courts review the State's reunification efforts on a case-by-case basis because "no pat formula exists for distinguishing between active and passive efforts."[22] A parent's incarceration does not relieve the State of its duty to provide active efforts, but it may affect the scope of the State's efforts and it may limit the options available to the State.[23] Services provided to a parent by the Department of Corrections count as efforts provided by the State.[24,]

**1.** **The trial court properly considered the State's efforts for the family as a whole.**

ICWA requires the State to make efforts to provide services designed to prevent the breakup of the Indian family.[25] In finding that the State met its burden, the trial court focused, first, on the efforts provided to the family as a whole. Those efforts

---

[21](...continued)
47.10.011(6) and (8). *See Alyssa B. v. State, Dep't of Health & Soc. Servs.*, 165 P.3d 605, 618 (Alaska 2007).

[22]     *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)) (internal quotation marks omitted).

[23]     *T.F. v. State, Dep't of Health & Soc. Servs.*, 26 P.3d 1089, 1096 (Alaska 2001) (quoting *A.A.*, 982 P.2d at 261).

[24]     *Id.* (citing *A.M.*, 945 P.2d at 305; *A.A.*, 982 P.2d at 263).

[25]     25 U.S.C. § 1912 (d) (2006).

included referrals for Sandy to Tanana Chiefs Conference Behavioral Health Service, Ralph Perdue Center, Resource Center for Parents and Children, Pichette Counseling, and Fairbanks Native Association; arrangements for urinalysis testing; assistance in obtaining housing; and assistance with transportation to facilitate family contact. The efforts also included facilitating family contact with other family members via in-person, telephone, and video-conference visits and providing therapy for Iris.

The trial court properly found that these services could be considered in evaluating efforts made on Claudio's behalf "because if [Sandy] had succeeded in her case plan, the State would not be moving to terminate [Claudio's] parental rights." This finding is in line with our caselaw. As we have stated, "OCS's active efforts toward a non-incarcerated parent are important because if the children are able to stay with the non-incarcerated parent, it is unlikely the incarcerated parent's rights will be terminated."[26]

### 2. The services provided to Claudio were adequate.

With respect to Claudio, OCS's efforts consisted of paternity testing, facilitating Claudio's ability to send Iris cards and letters, and providing in-person visits. The Department of Corrections provided Claudio with services designed to address, among other issues, his anger management problem. The trial court noted that the State's efforts for Claudio were "not perfect by any means," but that because Claudio's incarceration meant that Iris could not be placed in his custody within a reasonable time, the State's efforts toward him "were active and reasonable under the circumstances."

---

[26] *Doe v. State, Dep't of Health & Soc. Servs.*, 272 P.3d 1014, 1021 (Alaska 2012); *see also Dashiell R. v. State, Dep't of Health & Soc. Servs.*, 222 P.3d 841, 850 (Alaska 2009).

Claudio concedes that OCS was limited in the services it could offer him, but he argues that OCS "failed miserably" in two areas where it could make efforts — visitation and effectuating Claudio's desires for Iris's placement.

As to visitation, Claudio asserts that OCS basically had no contact with him. The record substantially supports Claudio's position for much of the time Iris was in custody. But Claudio was at least partly responsible for the lack of communication. More importantly, Claudio has no answer for the trial court's observation that "additional contact between [Iris] and [Claudio] would not have altered the situation in any substantive respect . . . . No matter what the Department does, [Iris] cannot be returned to [Claudio] in a reasonable time for him to parent her." We agree with the trial court. Even if Claudio's social worker should have made greater efforts to maintain contact with him, and even if OCS should have arranged visitation sooner, it is beyond dispute that no amount of contact or visitation would have altered Claudio's situation to allow him to act as Iris's parent before his release from prison, which is still several years in the future.[27] Claudio, not OCS, is responsible for that situation.

Finally, we reject Claudio's argument that OCS should have made additional efforts to place Iris with one of his parents. Leaving aside the question of whether OCS's placement decisions may be relevant in determining whether the State has made active efforts on behalf of an incarcerated parent,[28] it is clear that here OCS made all the efforts it reasonably could have been expected to make to place Iris with Claudio's parents. Specifically, Claudio's mother was without adequate housing to allow placement with her until 2012, and Claudio's father did not become a placement option

---

[27]     Claudio concedes that he will remain incarcerated for a "significant period" of Iris's life.

[28]     *See Josh L. v. State, Dep't of Health & Soc. Servs.*, 276 P.3d 457, 464-66 (Alaska 2012) (per curiam) (2-2 decision).

until October 2011. As discussed above, OCS's investigation into both of these homes was appropriate and timely, considering the circumstances.

We thus affirm the trial court's finding that OCS made active efforts to provide programs and services to prevent the breakup of the Indian family.

**C.     Termination Of Claudio's Parental Rights Was In Iris's Best Interests.**

Before a court may terminate a parent's parental rights, AS 47.10.088(c) requires the court to consider the best interests of the child. Alaska Child in Need of Aid Rule 18(c)(3) requires the court to find by a preponderance of the evidence that termination is in the child's best interests. Here, the trial court found that termination of Claudio's parental rights would serve Iris's best interests because Claudio will "not be able to parent [Iris] until she is well into her teen years." The court found that stability and permanency were crucial to Iris's health, and it concluded that Iris's "future should not be in flux depending on [Claudio's] incarceration and personal progress." The trial court's finding was supported by Claudio's testimony about his expected period of incarceration and his plans after his release and by Downes's and Bridgman's testimony about Iris's fragility and attachment issues.

The main thrust of Claudio's challenge to this finding is his assertion that OCS should have remedied Iris's status as a child in need of aid by placing her with one of his parents. But this argument misses the point, as the question for the trial court was not whether OCS should have done something differently in the past, but whether, at the time of the trial, termination of Claudio's parental rights was in Iris's best interests in order to free Iris for adoption or other permanent placement.[29] Nor does Claudio's argument address the gravamen of the trial court's finding, which is that wherever Iris ends up being placed, her placement must be permanent and stable, and must free her

---

[29]     AS 47.10.088(a).

from the uncertainties inherent in the possibility that Claudio might someday reenter her life as her parent. Such permanency, stability, and certainty can only come about if Claudio's parental rights to Iris are terminated. We affirm the trial court's finding that termination of Claudio's parental rights is in Iris's best interests.

## V.    CONCLUSION

Based on the foregoing discussion the trial court's order terminating Claudio's parental rights to Iris is AFFIRMED.