NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

LOUIS C., )
)
           Appellant, )
)
v. )
)
STATE OF ALASKA, DEPARTMENT )
OF HEALTH & SOCIAL SERVICES, )
OFFICE OF CHILDREN'S SERVICES, )
)
           Appellee. )
           )

Supreme Court No. S-18002

Superior Court Nos. 3AN-19-00248/
00249/00250/00251/00252 CN

MEMORANDUM OPINION
AND JUDGMENT[*]

No. 1860 – November 17, 2021

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Justin Gillette and Sharon Barr, Assistant Public Defenders, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Bianca N. Jackson, Assistant Attorney General, Anchorage, Michelle L. McComb, Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Emily Waters and Lisa Wilson, Assistant Public Advocates, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

---

[*]       Entered under Alaska Appellate Rule 214.

# I.   INTRODUCTION

The superior court terminated a father's parental rights to five children after he failed to remedy the "deplorable" conditions that led the Office of Children's Services (OCS) to take emergency custody of them. The father appeals, arguing that OCS did not make reasonable efforts to reunify his family. Because the superior court did not err when it found that OCS had made reasonable efforts, we affirm its termination order.

# II.   BACKGROUND

## A.   Facts

Louis C. and Tammy S. are the parents of five children.[1] In March 2019, Tammy went to the emergency room with "multiple stab wounds, . . . lacerations, and facial and body bruising" and reported "growing marijuana and using methamphetamine." Hospital staff contacted OCS to report concern for the children in the family.

OCS attempted to contact the three school-aged children the next day, but the children were not in school and school staff reported that their attendance was "very inconsistent." Three weeks later, in April, the children attended school and school staff contacted OCS.

An OCS caseworker interviewed the children at school. The children were "very unclean" and "smelled as if they had not bathed in several days." They reported that there was often no food in their home, sometimes for days, and that Tammy spanked them with a wooden broom handle and Louis spanked them with a metal rod. One child reported rats and "large black insects" in their home. A teacher told the caseworker that the children were "always unclean" when they attended school and that on Fridays staff sent extra food home with them for the weekend.

---

[1]     Pseudonyms have been used to protect the privacy of family members.

The caseworker then went to the family's home to try to contact Louis, Tammy, and the other children. The caseworker noticed "a foul odor" at the door. A child answered the door but did not open it, so the caseworker contacted the police for assistance. The police advised her that there was a warrant for Louis's arrest and arrested him shortly after arriving at the house.

The caseworker went inside looking for Tammy, who was not there.[2] The house was unsanitary, with a foul odor and spilled food and liquid throughout the kitchen, dirty clothes and diapers all over the bedroom, dirty diapers on the bathroom floor, and garbage in the sink and shower. The caseworker noted "feces smeared on the walls." The two younger children were dirty, "had a foul odor," and had dirt caked under their finger- and toenails. One of them told the caseworker that they had not eaten all day.

OCS took emergency custody of all five children. Because there was no clean clothing or food in their home, the children went first to the OCS office for clothes and snacks before being placed in a foster home. Subsequent hair follicle testing revealed that all five tested positive for methamphetamine and two also tested positive for amphetamine. The children reported that Louis hit them with "wires, [a] cane, and [other] objects." OCS arranged for the children to be interviewed at a child advocacy center, where physical examinations revealed scars on the children. The police opened an investigation and asked OCS not to contact Louis until they had an opportunity to interview him.

OCS arranged a team decision meeting in early May. Both parents participated, Louis by telephone from jail. Louis was referred to a number of services for domestic violence, substance abuse, and parenting.

---

[2]    OCS later learned that Tammy was hospitalized.

Louis was released from jail some time after the meeting. OCS was unable to reach him for several months either at any of the phone numbers he had provided or through his attorney.

In August another caseworker was assigned to the family's case. In November she was able to meet with Louis at a restaurant. They discussed the treatment he needed as well as his housing and employment. They also scheduled a meeting at OCS a few days later to go over the case plan and arrange for phone calls with the children. The meeting was rescheduled to December due to Louis's last-minute request to relocate the meeting, which the OCS worker could not accommodate.

Both Louis and Tammy attended the December meeting. The caseworker helped them schedule assessments for mental health and substance abuse, gave them copies of their case plans and information about starting random urinalysis, and offered them bus passes.

In April 2020 OCS filed a petition to terminate both parents' rights to the children. The petition noted that OCS had been able to have only "sporadic" contact with Louis and the parents had not "made themselves available to [OCS]" or engaged in visits or with the tasks on their case plans. OCS began pursuing an Interstate Compact on the Placement of Children (ICPC) application to move the children to an aunt and uncle's home in California.

In May 2020 Louis was again incarcerated. The family's case was transferred to another caseworker for several months; it was transferred again in July. That caseworker was able to finalize the ICPC soon after receiving the case. In September she was able to speak to Louis, who remained in jail. She also arranged for him to participate by telephone in a meeting to set up services in California for the children. Another caseworker contacted him once more before he was released in late November. But after he was released from jail, Louis did not have contact with OCS.

## B. Termination Trial

A two-day trial was held in late January and early February 2021. Four of the five OCS caseworkers who had been assigned to the case testified. The first caseworker acknowledged she had no contact with Louis after the initial team decision meeting in May 2019. She testified that she had not made contact "out of deference" to the police request.

The next caseworker testified about her contacts with Louis between August 2019 and May 2020. She described her difficulty contacting him before arranging to meet him at a restaurant in the fall of 2019 after he was released from jail. She testified that she was able to meet with him two additional times before the case was transferred. The caseworker testified that because of the children's negative reactions following a phone call with their father, OCS decided to consult the children's counselors before scheduling more phone calls.

The caseworker assigned in July 2020 described her involvement with the family. She testified that she did not know where Louis was at the time and that she focused on completing the unusually complicated ICPC for the children before turning her efforts to locating him. Before the ICPC was complete, Louis was incarcerated again. The caseworker was able to have contact with him by telephone and also met with him several times, going over his case plan and the services needed to regain custody of the children. And she set up regular telephone calls between Louis and the children after coordinating with the children's counselors and foster parents.

The final caseworker testified that she was assigned to the case in October 2020. She had a single telephone call with Louis in November while he was incarcerated. They discussed Louis's desire for more telephone calls with his children; the caseworker recommended that Louis participate in family therapy with the children's therapist to work on ways to increase the frequency of calls safely. She also testified that

they went over the case plan and that she encouraged Louis to complete the treatment and classes listed. Finally, she provided her own and his attorney's contact information to him so he could update them about his address and contact information after he was released. Louis did not have any contact with OCS again until late January 2021.

Louis did not testify at the trial and did not call any witnesses. Tammy also did not testify or call witnesses.

The superior court put its termination findings on the record and issued a written order afterward. The court found clear and convincing evidence that the children remained in need of aid under AS 47.10.011(1) abandonment, (6) physical harm, and (9) neglect.[3] The court's oral findings considered each of the bases on which the children were in need of aid in relation to each other, holding that the "virtually uninhabitable" home, "hungry, dirty" children with "unclean" clothes who "were not being cared for in . . . basic, fundamental ways," combined with the children's positive tests for methamphetamine, made "clear that the children had been abandoned by their parents and were not being cared for properly." The court also found that the parents had "fundamentally failed within a reasonable time to remedy" their conduct and the conditions.

The court found by clear and convincing evidence that OCS made "timely and reasonable efforts to . . . work with the parents to ultimately try to get them back together." The court acknowledged that while "the efforts are reasonable, they're not perfect." In making its finding, the court specifically noted that "an out-of-state component" complicated the case and "throw in a global pandemic, and . . . [it's]

---

[3]     Alaska Statute 47.10.011 has 12 sections that describe various grounds for a child to be in need of aid.

complicated even further." And the court found by a preponderance of the evidence that termination was in the children's best interests.

Louis appeals, challenging only the court's finding that OCS made reasonable efforts.[4]

## III. STANDARD OF REVIEW

"Whether OCS made reasonable efforts to reunify [a] family is a mixed question of law and fact."[5] "[W]e review the superior court's factual findings for clear error."[6] A factual finding is clearly erroneous if our "review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[7] "We will not reweigh evidence when the record provides clear support for the [superior] court's ruling."[8] However, "[w]hether factual findings satisfy the requirements of the applicable [CINA] statute is a question of law that we review de novo."[9]

---

[4]    Tammy does not participate in this appeal.

[5]    *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 265 (Alaska 2019) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 428 (Alaska 2012)).

[6]    *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 788 (Alaska 2019) (citing *Sherman B.*, 290 P.3d at 427).

[7]    *Annette H.*, 450 P.3d at 265 (quoting *Claudio P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 860, 863 (Alaska 2013)).

[8]    *Id.* (quoting *Claudio P.*, 309 P.3d at 863).

[9]    *Id.* (quoting *Theresa L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 353 P.3d 831, 837 (Alaska 2015)).

## IV.   DISCUSSION

Before terminating parental rights, the superior court must find that OCS made "timely, reasonable efforts to provide family support services . . . to the parents . . . designed . . . to enable the safe return of the child[ren]."[10]  "OCS must identify relevant support services that may aid the parent in remedying the relevant conduct or conditions and must actively help the parent to obtain" them.[11]  OCS "fulfill[s] this obligation 'by setting out the types of services . . . in a manner that allows the parent to utilize the services.' "[12]  The court looks at OCS's "efforts in their entirety"[13] and the efforts "must be reasonable but need not be perfect."[14]

Louis asserts that there were two periods when OCS did not make reasonable efforts: between late April and fall 2019 and from May through September 2020.

Louis was arrested at the same time OCS assumed emergency custody of the children in April 2019.  In May OCS arranged a team decision meeting in which he participated by telephone.  But after he was released from jail in June, Louis and OCS had no contact until he met with a caseworker at a restaurant in the fall.  Louis's

---

**10**      AS 47.10.086(a).

**11**      *Sherman B. v. State, Dep't of Health & Soc Servs., Off. of Child.'s Servs.,* 310 P.3d 943, 952 (Alaska 2013).

**12**      *Id.*

**13**      *Barbara P. v State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.,* 234 P.3d 1245, 1262 (Alaska 2010) (citing *Frank E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

**14**      *Emma D. v State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.,*322 P.3d 842, 850 (Alaska 2014) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 432 (Alaska 2012)).

argument overlooks the efforts OCS did make during that time, including referring him to the services identified in his case plan and helping him complete an application for substance abuse treatment, arranging a phone call with the children, attempting to put him in touch with his attorney and attempting to reach him through his attorney, as well as providing services to the children.[15]

Louis also asserts that OCS's failure to arrange regular contact between him and the children during this time was not reasonable. But the caseworker testified she refrained from contacting Louis for any reason after the team decision meeting at the request of the police who were investigating him. OCS "has some discretion both in determining what efforts to pursue and when to pursue them."[16] OCS reasonably exercised its discretion when it chose to respect the police request and to focus its efforts on other ways to assist the family.

During the second period Louis identifies, he was again incarcerated. The assigned caseworker admitted that she did not realize he was in jail when she took over the case, but she also testified that she was focused on completing the ICPC to get the children to their relatives' home in California. Like her predecessor's decision to defer

---

[15] We remind the superior court that its findings must be adequate for our review. *See Annette H. v. State, Dep't of Health & Soc. Servs. , Off. of Child.'s Servs.*, 450 P.3d 259, 267 (Alaska 2019) (citing *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 139-40 (Alaska 1997)). Although the evidence presented at trial supports the superior court's finding that reasonable efforts were made, the court's findings — both orally and on the written form provided by OCS for the court's signature — fail to provide sufficient detail when considered on their own to meet this standard. In *Annette H.*, we noted that the superior court's written findings were "largely conclusory" and "it [was] only because the court's oral findings made reference to specific facts and evidence presented at the termination trial that we [were] able to review its child in need of aid determination at all." *Id.* In this case, the superior court's oral findings are nearly as cryptic as its written order.

[16] *Sherman B.*, 290 P.3d at 432.

to the police investigation, the caseworker's decision to concentrate on moving the children to their aunt and uncle's home was a reasonable exercise of OCS's discretion. As the caseworker testified, OCS "couldn't just leave the children in foster care" while Louis was in and out of jail and Tammy could not be located.

And Louis did not provide reliable contact information or maintain contact with OCS, or his own attorney, when he was not in jail. Although OCS cannot stop making efforts to assist a reluctant parent, "a parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide."[17]

Finally, "[a]lthough a parent's incarceration does not relieve OCS of its duty to make reasonable efforts, it affects the scope of that duty."[18] We have explained that "the practical circumstances surrounding a parent's incarceration — the difficulty of providing resources to inmates generally, the unavailability of specific resources, and the length of incarceration — may have a direct bearing on what . . . remedial efforts are possible."[19] We have repeatedly approved OCS's reliance on services made available to inmates by the Department of Corrections (DOC).[20] Given Louis's repeated

---

[17] *Emma D.*, 322 P.3d at 850 (quoting *Sherman B.*, 290 P.3d at 428).

[18] *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 646 (Alaska 2013) (citing *Barbara P.*, 234 P.3d at 1262).

[19] *Id.* at 647 (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)). Though *A.A.* concerned OCS duties in the context of the ICWA "active efforts" requirement, we noted in *Casey K.* that this reasoning extends to CINA "reasonable efforts" determinations. *Id.* at 647 n.35 (citing *Barbara P.*, 234 P.3d at 1262).

[20] *See, e.g.*, *id.* at 646 ("When a parent is incarcerated, DOC rather than OCS has the primary responsibility of providing services."); *A.M. v. State*, 945 P.2d 296, 305-06 (Alaska 1997) ("It is of no particular consequence that the Department of Corrections (DOC), rather than [OCS's predecessor], made these active remedial efforts.

(continued...)

incarceration, OCS's ability to provide services to him was limited, and DOC's pandemic safety measures further reduced the availability of classes and other programs. Gaps in OCS's efforts while Louis was in jail are not sufficient to persuade us that it was error to find that the efforts were reasonable.

As the superior court found, OCS's "efforts are reasonable, they're not perfect." The lapses that Louis identifies are not sufficient when viewing OCS's efforts in their entirety to show that OCS did not make reasonable efforts.[21] Despite the lapses Louis identifies, OCS made reasonable efforts by identifying services to help him remedy the conditions that led to his children being in OCS custody; referring him to specific programs and classes, including assisting him with applying to them; arranging regular contact with the children; and attempting, often unsuccessfully, to remain in contact with Louis.

## V.    CONCLUSION

The superior court did not err when it found that OCS had made reasonable efforts to reunite Louis with his children. We AFFIRM the superior court's decision to terminate parental rights.

---

[20]    (...continued)
. . . A.M. was committed to DOC's care and custody; by law, DOC was the state agency with primary responsibility for his successful rehabilitation . . . . [OCS's predecessor's] active intrusion . . . into DOC's therapeutic programs would have been inappropriate and unreasonable, if not impermissible as a matter of law and impossible as a matter of practical reality." (internal citations and footnotes omitted)).

[21]    *See Casey K.*, 311 P.3d at 646 (explaining imperfect efforts and brief lapses in service provision do not foreclose finding reasonable efforts when case viewed in its entirety); *see also Barbara P.*, 234 P.3d at 1262 (OCS failure to coordinate visitation with incarcerated parent did not preclude reasonable efforts finding when efforts viewed overall).