NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JACOBY C., ) | |
| ) | Supreme Court No. S-18147 |
| Appellant, ) | |
| ) | Superior Court No. 3AN-18-00456 CN |
| v. ) | |
| ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, ) | |
| OFFICE OF CHILDREN'S SERVICES, ) | No. 1888 – April 20, 2022 |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Jennifer Henderson, Judge.

Appearances: Claire F. DeWitte, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, and Borghesan, Justices. [Henderson, Justice, not participating.]

## I.    INTRODUCTION

A father appeals the termination of his parental rights, arguing that the Office of Children's Services (OCS) failed to make active efforts to reunify him with his

---

\*        Entered under Alaska Appellate Rule 214.

child as required by the Indian Child Welfare Act (ICWA). In particular, he argues that OCS's efforts in the second half of the case did not cure its failure to make active efforts in the first half of the case. Because the superior court did not err when it found that OCS had made active efforts overall, we affirm the termination of parental rights.

## II.  BACKGROUND

Jacoby and Bria are the parents of four-year-old Julien.[1] Julien is an "Indian child"[2] as defined by ICWA.[3] OCS took custody of Julien in September 2018 after receiving reports of domestic violence, parental neglect, and substance abuse. OCS placed Julien in a foster home with his older brother.[4]

The assigned caseworker created a case plan for both parents in October 2018. After an initial meeting with both parents, the caseworker was unable to contact Jacoby until April 2019. The plan required each of them to obtain a substance abuse assessment and follow the assessment's recommendations, submit to random urinalyses and hair follicle testing, participate in parenting classes, and work with a peer navigator. The caseworker made referrals for substance abuse assessments, hair follicle testing, and urinalyses and arranged for family visitation. The caseworker was frequently unable to reach Jacoby, and Jacoby did not initially follow up on the referrals for hair follicle testing or urinalyses. Jacoby did not visit Julien regularly.

---

[1]     Pseudonyms are used for all family members.

[2]     *See* 25 U.S.C. § 1903(4).

[3]     25 U.S.C. §§ 1901-1963. ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

[4]     Bria previously relinquished parental rights to Julien's older brother.

Between September 2018 and February 2019, Jacoby was charged with various criminal offenses. He was in jail from December 2018 until June 2019 and again in August and September 2019 for violating his conditions of release.

During Jacoby's first period of incarceration, the caseworker met with him twice and Jacoby completed a substance abuse assessment through the Department of Corrections. The assessor diagnosed him with severe opioid and amphetamine use disorders in early remission and recommended that he participate in a high-intensity residential treatment program. After Jacoby's release, the caseworker met with him to update the case plan and referred him for intake appointments with substance abuse and parenting programs, both of which he completed. Jacoby engaged sporadically in substance abuse treatment but relapsed frequently.

The caseworker documented little more than providing referrals for Jacoby. There were seven months during which the caseworker did not document any efforts toward Jacoby.

The caseworker documented some efforts toward Bria, who was more engaged with her case plan than Jacoby. The caseworker arranged family visits, including some unsupervised visits between Bria and Julien. OCS also contacted Julien's tribe and several relatives to try to find a suitable permanent placement.

In March 2020 the case was transferred to a second caseworker. The caseworker attempted to contact Jacoby beginning in March but was only able to arrange a meeting in July, and otherwise was often unable to reach him. When the caseworker was able to reach him, Jacoby reported that he continued to abuse substances but also said he wanted to re-engage with his case plan. The caseworker monitored Jacoby's compliance with the case plan, discussed Jacoby's goals with him and suggested options tailored to those goals (such as employment services and different options for treatment

for heroin and methamphetamine use), offered Jacoby bus passes that he refused, and arranged for urinalyses. In a September 2020 meeting, Jacoby stated that he did not need further assistance from OCS. Jacoby stopped visiting Julien altogether in late 2020.

Jacoby was incarcerated again in December 2020 and was in and out of custody through May 2021. The caseworker was able to reach Jacoby by phone at the jail and just after his release in May 2021.

The caseworker contacted Bria regularly, updated her case plans and monitored her progress, discussed counseling options, and offered to help with other services. The caseworker often made Bria responsible for setting up her own services. Like Jacoby, Bria in September 2020 "indicated there was not anything else OCS could do to assist her [and] she knew what she needed to do."

The caseworker continued OCS's efforts to find relatives who could provide a home for Julien, explaining the process to some of Jacoby's relatives. In October 2020 OCS filed a petition to terminate both parents' parental rights, alleging that they had failed to remedy the conduct and conditions that had placed Julien at risk. A termination trial was held over two days in June and July 2021.

OCS called the first caseworker's supervisor as a witness because the caseworker was no longer employed by OCS. The supervisor admitted that, based on what was documented in the OCS database, it did not seem that the caseworker made "consistent attempts to reach out to [Jacoby]." She was unable to confirm whether OCS had sent collateral information to substance abuse providers or whether the caseworker provided updated referrals after Jacoby's relapses. On cross-examination she admitted "there were at least seven months" without documented efforts, though she suggested there might have been informal communications, such as text messages, between the caseworker and Jacoby. She also noted there was an email in September 2019 from

Jacoby stating he had been trying to reach the first caseworker "for some time" and asking for a call back, but there was no documentation that the caseworker contacted Jacoby at that point.

The supervisor testified that there were "a lot more efforts with [Bria]," who was easier to contact and who engaged with her case plan to some extent. According to the supervisor, the caseworker had tried to ensure quality family visits by "getting creative" and "expanding" opportunities, such as arranging unsupervised visits between Bria and Julien, making plans to switch to a "family-friendly environment" once initial visitation progressed well, and planning a trial home visit.[5]

The supervisor also testified that the first caseworker had worked with Julien's tribe and had sent letters to 15 relatives to try to find one who could serve as Julien's foster parent. The supervisor admitted on cross-examination that the OCS file indicated that it was not until September 2020 that OCS had followed up on a March 2019 request from Jacoby's sister to place Julien with her; the caseworker acknowledged it was OCS policy to follow up on such a request, conduct background checks, and make a decision within 45 days.

The second caseworker testified about his efforts to meet with and assist Jacoby. The caseworker noted that, when he could not reach Jacoby directly, he would try to go through "collaterals" such as Bria or other family members, or to use alternate methods such as email or different phone numbers, and eventually in early 2021 he contacted shelters and a soup kitchen to try to reach Jacoby. The caseworker claimed that, though he often asked what else Jacoby needed, Jacoby "always knew what he

---

[5] The home visit did not occur and family contact reverted to supervised visits because Bria began living with Jacoby again and OCS believed Jacoby posed a risk to Julien due to continued substance abuse.

needed to do" and by September 2020 said he did not need any further referrals or support from OCS. The caseworker testified that after the first trial day in June 2021, Jacoby contacted him for information on substance abuse treatment options. The caseworker stated that he "gave [Jacoby] some phone numbers" and that from the case notes it appears the caseworker told Jacoby he could call the providers directly, but "it looks like he didn't want to talk." The caseworker offered more referrals and asked if OCS could do "anything else," but Jacoby indicated that he would follow up later. He then became unreachable.

The caseworker acknowledged that when Jacoby was incarcerated, it was more difficult to meet with him and Jacoby's ability to participate in the case plan was limited. But ultimately, the caseworker opined, Jacoby did not progress on his case plan "because of his lack of contact, his lack of consistency with visitation," and his failure to "engage[] in the services."

The second caseworker also testified he tried to provide services to Bria and that he continued to look for relatives who could provide a home for Julien. The caseworker stated he had detailed conversations with members of Jacoby's family to explain the foster care licensing process and how to seek a variance if they were denied. He said he tried to encourage Jacoby's mother and sister to follow through with the licensing process but they were each denied due to safety concerns.

Jacoby's sole witness, his mother, testified that both caseworkers had failed to explain and facilitate the process for her applying to become Julien's foster parent.

The superior court terminated Jacoby's parental rights, finding clear and convincing evidence that Julien was a child in need of aid due to Jacoby's abandonment and substance abuse and that Jacoby had failed within a reasonable time to remedy his

conduct and the conditions that endangered Julien.[6] The court found beyond a reasonable doubt, supported by expert testimony, that returning Julien to Jacoby would result in serious emotional or physical damage, and concluded that termination of Jacoby's parental rights was in Julien's best interests.[7]

The court also concluded that OCS made active efforts to provide services designed to prevent the breakup of the family, which unfortunately were unsuccessful. The court acknowledged that this was the "most contested" and "the most difficult" finding to make. The court "ha[d] real concerns about the uncertainty of what was done, or what efforts were made, by [OCS] . . . during [the first caseworker's] time with the case." The court noted that because the first caseworker had failed to document efforts, it could not determine if he had made any efforts "beyond basic case planning [and] some limited documented contact." The court found that it was "more likely than not that there was, in conjunction with that failure to document, also a failure to attempt contact and to reach out to [Jacoby] when he was not engaged," or to walk Jacoby through the case plan steps "as much as is required, frankly, by [OCS's] own standards."

In contrast, the court found that "over these last 15, 16 months," of the second caseworker's involvement, "extensive efforts" were made to contact Jacoby, engage him in the case plan, and keep him informed about the exact steps he needed to

---

[6]    AS 47.10.011 lists twelve potential bases upon which to determine a child is in need of aid. Subsection (1) provides that a child may be found in need of aid if "a parent . . . has abandoned the child . . . , and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid . . . ." Subsection (10) provides that a child can be found in need of aid if "the parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant," which "has resulted in a substantial risk of harm to the child . . . ."

[7]    *See* AS 47.10.088(a).

follow. The superior court additionally found that "the efforts directed toward the other members of the family" were active. The court concluded that, although it was a significant point of contention to determine "at what point . . . [OCS was] able to establish . . . active efforts" after its failures in the first half of the case, OCS's efforts in their totality were active. And, despite the difficulties caused by the pandemic, the court found that OCS's active efforts were unsuccessful due primarily to Jacoby's failure to engage consistently with his case plan.

Jacoby appeals, arguing that the superior court erred when it found OCS had made active efforts overall because the efforts in the second half of the case and efforts made toward the rest of the family were insufficient to compensate for the lack of active efforts in the first half.[8] We disagree. Because the superior court did not err by finding that OCS made active efforts, we affirm the termination of Jacoby's parental rights.

## III. STANDARD OF REVIEW

"Whether [OCS] complied with the 'active efforts' requirement of [ICWA] is a mixed question of law and fact."[9] We review "the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[10] "[F]indings are clearly erroneous if a review of the entire

---

[8]    Bria relinquished her parental rights during trial and she does not participate in this appeal.

[9]    *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 550 (Alaska 2017) (second alteration in original) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[10]    *Sam M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442
(continued...)

record in the light most favorable to the prevailing party leaves us with a definite and firm conviction that a mistake has been made."[11]

## IV.   DISCUSSION

ICWA requires that a "party seeking to effect a . . . termination of parental rights to[] an Indian child . . . [prove] that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[12] Current Bureau of Indian Affairs regulations define active efforts as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[13] We have held that active efforts are determined "on a case-by-case basis because 'no pat formula' exists for distinguishing between active and passive efforts."[14] Generally, efforts are passive "where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition"; efforts are active "where the state

---

[10]     (...continued) P.3d 731, 736 (Alaska 2019) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

[11]     *Marcia V. v. State, Off. of Child.'s Servs.*, 201 P.3d 496, 502 (Alaska 2009).

[12]     25 U.S.C. § 1912(d); *see also* 25 C.F.R. § 23.120(a) (2021).  Furthermore, "[a]ctive efforts must be documented in detail in the record."  25 C.F.R. § 23.120(b) (2021); *see also Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 981-82 (Alaska 2019).

[13]     25 C.F.R. § 23.2 (2021).

[14]     *Philip J.*, 314 P.3d at 527 (quoting *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)); *see also* 25 C.F.R. § 23.2 (2021) ("Active efforts are to be tailored to the facts and circumstances of the case . . . .").

caseworker takes the client through the steps of the plan,"[15] such as by helping the parents "identify appropriate programs and complete the necessary paperwork to apply" or "connect[ing] them to other resources" rather than simply providing referrals.[16] "[T]he superior court may consider '[OCS's] involvement *in its entirety*' in evaluating active efforts,"[17] which includes efforts made toward the parent in the entire case as well as toward the family aimed to prevent its breakup.[18]

Jacoby argues that his case is similar to our recent decision in *Clark J. v. State, Department of Health & Social Services, Office of Children's Services*[19] and that we should reverse the termination of his parental rights as we did in that case. In *Clark J.* we reversed a termination order after OCS failed to make efforts to reunify Clark with his children after their mother died.[20] The child protection case was open for four years.[21] During the first two, OCS directed its efforts primarily toward the children's

---

[15]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 271 (Alaska 2011) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

[16]     *Bill S.*, 436 P.3d at 982.

[17]     *Philip J.*, 314 P.3d at 528 (emphasis added) (quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1114 (Alaska 2010)).

[18]     *Josh L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 457, 463-64 (Alaska 2012); *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 850 (Alaska 2009) (efforts directed toward one parent count as efforts toward family reunification).

[19]     483 P.3d 896 (Alaska 2021).

[20]     *Id.* at 903-04.

[21]     *Id.*

mother.[22] But after she died, OCS failed over the next two years to make active efforts to Clark.[23] We concluded OCS had failed to make active efforts overall.[24] Jacoby urges us to do the same here because "OCS's lack of active efforts spanned half of the case — one year and six months."

Jacoby appears to argue that whenever OCS fails to make active efforts for "half of the case" we should hold that OCS failed to make active efforts to reunify the family and reverse termination.[25] But Jacoby oversimplifies our case law.

The superior court considers the entirety of OCS's efforts to reunify a family.[26] In each case Jacoby cites, we reviewed whether the superior court correctly determined that the period when active efforts were made compensated for the time during which they were not.

In *Clark J.* we concluded that the active efforts directed toward the mother in the early years of the case failed to make up for OCS's lack of effort toward the father for the rest of the case.[27] In other cases like *Maisy W. v. State, Department of Health &*

---

[22]     *Id.* at 902-03.

[23]     *Id.* at 903.

[24]     *Id.* at 903-04.

[25]     Jacoby contrasts OCS's failure for "half of the case" with cases where we affirmed active efforts despite lack of efforts for three months, *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1269 (Alaska 2008), and seven months, *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990-91 (Alaska 2002).

[26]     *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013).

[27]     *Clark J.*, 483 P.3d at 903-04.

*Social Services, Office of Children's Services* and *E.A. v. State, Division of Family &
Youth Services*, in contrast, we concluded that despite periods of inadequate OCS efforts,
the efforts toward the parent in other periods were sufficient to amount to active efforts
overall.[28]

The superior court in this case faced the inverse of *Clark J.* OCS admitted
that it failed to provide active efforts during the year and a half the initial caseworker was
assigned. But after that caseworker was replaced, the second caseworker made
"extensive efforts . . . in multiple ways" to work with Jacoby while being "respectful of
[Jacoby's] rights as a parent." The caseworker was able to maintain at least sporadic
contact with Jacoby through the time of the termination trial, met with him, and offered
to assist him to obtain needed services. Jacoby declined offers of assistance and reported
that he was able to obtain the services on his own.

We agree with the superior court that whether OCS made active efforts to
reunify Jacoby with Julien is a close question. But its ultimate conclusion was not
clearly erroneous: besides active efforts made in the second half of the case, the superior
court found that, even during the first caseworker's time, "some efforts" toward Jacoby
were documented. For instance, Jacoby was able to complete a substance abuse
treatment assessment while he was incarcerated. Although those efforts in the first half
alone do not amount to active ones, they count toward the entirety of OCS's active
efforts.[29]

---

[28]    *See Maisy W.*, 175 P.3d at 1269; *E.A.*, 46 P.3d at 990.

[29]    *See Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*,
311 P.3d 637, 646-47 (Alaska 2013) (services provided to parent by Department of
Corrections are relevant to active efforts analysis); *see also Claudio P. v. State, Dep't of
Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 860, 865 (Alaska 2013) ("Services
(continued...)

OCS's efforts "need not be perfect; they need only be reasonable under the circumstances."[30] And both a parent's incarceration and "[a] parent's willingness to participate in services [are] relevant to the scope of the efforts OCS must provide" and inform our active efforts analysis.[31] Jacoby's periodic incarceration and his failure to maintain contact with OCS or service providers limited the efforts OCS was able to make.[32]

The superior court also found that OCS made active efforts to find a relative placement for Julien. The superior court is entitled to consider OCS's efforts to place a child with family members because such a placement can help the family to remedy the issues preventing reunification.[33] Though the superior court found that

---

[29]   (...continued) provided to a parent by the Department of Corrections count as efforts provided by the State.").

[30]   *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 (Alaska 2015); *see also Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011) ("[T]he active efforts requirement does not require perfection. Our concern is not with whether the State's efforts were ideal, but with whether they crossed the threshold between passive and active efforts.").

[31]   *Casey K.*, 311 P.3d at 645-46 (first alteration in original) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 432 (Alaska 2012)); *see also id.* at 646 ("Although a parent's incarceration does not relieve OCS of its duty to make reasonable efforts, it affects the scope of that duty.").

[32]   *See Sylvia L.*, 343 P.3d at 433 ("Failed attempts to contact the parent or obtain information . . . may qualify as active efforts if the parent's evasive or combative conduct 'rendered provision of services practically impossible.' " (Quoting *E.A.*, 46 P.3d at 990)).

[33]   *David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 (continued...)

during the first caseworker's involvement there was "a great deal of delay" in trying to place Julien with close relatives or to consult with his tribe, it recognized "some efforts" were made during the first half of the case. And it found that OCS made "extensive" and "quite active" efforts along with Julien's tribe to find and work with extended family members to obtain foster care licenses.

The superior court's factual findings are supported by the record and it did not err by concluding that OCS's efforts over the entirety of this case were active.

## V.   CONCLUSION

We AFFIRM the superior court's termination of Jacoby's parental rights.

---

[33]   (...continued)
P.3d 767, 779 (Alaska 2012).